**STATE of Delaware, Plaintiff Below, Appellant,**

v.

**David ABEL, Defendant Below, Appellee.**

No. 50, 2012.

Supreme Court of Delaware.

Submitted: Oct. 10, 2012.
Decided: Dec. 5, 2012.
Amended on Denial of Reargument:
Jan. 22, 2013.

Paul R. Wallace, Department of Justice, Wilmington, Delaware for appellant.

Joseph A. Hurley, Wilmington, Delaware for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

STEELE, Chief Justice, for the Majority:

A State Trooper stopped a Hells Angels member for speeding. When asked where he was going, the defendant cordially declined to answer. The State Trooper informed the defendant he would pat him down, and the defendant revealed he possessed two handguns. We **AFFIRM** the Superior Court judge's grant of defendant's motion to suppress because under the totality of the circumstances, no particularized, reasonable, articulable suspicion that the defendant was presently armed and dangerous existed.

## I. FACTUAL AND PROCEDURAL HISTORY

Delaware State Trooper John Andrew Lloyd, while patrolling Interstate 95 on June 4, 2011, observed two motorcycles driving southbound at a higher rate of speed than normal traffic. Lloyd also observed that one of the drivers, defendant David Abel, wore Hells Angels insignia or "colors" on his clothing. After deciding to "pace" the two motorcyclists with another Trooper, Lloyd determined they were driving 80 miles per hour in a 55–mile–per-hour zone. When Lloyd activated the lights on his unmarked police car, David Abel pulled over on the left shoulder and his companion pulled over on the right. Lloyd stopped the motorcycle driven by Abel, and the other Trooper stopped Abel's companion on the other side of the interstate.

Lloyd is a veteran member of the Delaware State Police intelligence unit, a group that receives training about and investigates criminal activity by Outlaw Motorcycle Gangs (OMGs). Hells Angels Motorcycle Club and Pagans Motorcycle Club are both recognized as OMGs. Police generally consider Delaware to be Pagan territory, and the Pagans and Hells Angels are rivals with a history of violent interactions. While Lloyd does have significant experience with Pagans members, he testified at the suppression hearing that his "experience with [Hells] Angels is very limited. Delaware doesn't have one[—]I think we have one person in the State. Pagans we have. I couldn't tell you how many we have. I encounter Pagans all the time."[1]

During the stop, "Abel remained calm and his hands remained primarily in view on the handlebars of the motorcycle."[2] His "hands were in view before Lloyd approached ..., except for when Abel reached to retrieve his license and registration." Not only were his hands in view, but also because of the motorcycle's handlebars, "Able had to raise his arms to grip" them.[3] Lloyd's patrol car videotaped the interaction between Lloyd and Abel:

[9:45:16]　[a.m.]

Trooper Lloyd: What's going on?

David Abel: Nothing, how are you?

---

1. App. to Opening Br. A–56.

2. *State v. Abel*, 2011 WL 5221276, at *1 (Del.Super. Oct. 31, 2011).

3. *Id.* at *1 n. 7.

[Lloyd]: What's going on? We got you going 80 and you were tailgating that car.

[Abel]: [Unintelligible]

[Lloyd]: Any reason you were going that fast?

[Abel]: Just running a little late, that's all.

[Lloyd]: Where you headed?

[Abel]: We're going out on a run today.

[Lloyd]: Where to?

[Abel]: I think you got everything there [Abel is handing Lloyd his license and registration].

[Lloyd]: Where you guys going?

[Abel]: [laughing] I'm not gonna go through all that—I'm not gonna go through all that man. We're just goin' out for a ride that's all.

[Lloyd]: Yeah no big deal. I mean I'm not . . .

[Abel]: [Unintelligible] I mean yeah. Like I said we're just running late. [Unintelligible] and that's all . . .

[Lloyd]: In Delaware or out of Delaware?

[Abel]: We're going out of Delaware. If you guys let us go, we'll get right out of Delaware! [laughs]

[9:45:53] [a.m.]

[Lloyd]: Any weapons on ya?

[Abel]: No.

[Lloyd]: No guns?

[Abel]: No I'm good.

[Lloyd]: Alright, I'm gonna pat you down make sure you don't have a gun on ya.

[Abel]: Why ya, I mean, for what?

[Lloyd]: I'm gonna pat ya down.

[Abel]: I've got a gun [Unintelligible].

[Lloyd]: Huh?

[Abel]: I've got a gun. I've got two. I've got one here [points to jacket] and one here [points to pants].

[Lloyd]: Alright.

[Abel]: I've got a permit to carry, but I don't have one in Delaware.

[Lloyd]: Alright. Let me just make sure you're safe here. Put your hands behind your back.

[9:46:11 a.m.] [4]

After this brief interaction, Lloyd conducted a pat down, recovered the two handguns, and arrested Abel.

The State charged Abel with speeding and two counts of Carrying a Concealed Deadly Weapon.[5] Abel filed a motion to suppress, arguing that "he did not exhibit any conduct or behavior that would create a reasonable suspicion that he was armed or dangerous" and "that an affiliation with a motorcycle gang, in and of itself, is insufficient to provide a reasonable, articulable suspicion that an individual is armed and dangerous."[6] The State countered that "the combination of Abel's [Hells Angels] vest and his refusal to reveal his destination were enough to warrant the pat down for weapons under the totality of the circumstances."[7] The trial judge heard argument and granted the motion to suppress in her October 31, 2011 opinion.[8]

---

**4.** App. to Opening Br. A–68 to A–69 (some brackets in original) (Transcript of State's Suppression Exhibit No. 1). The transcript was not available for the trial judge to review during the suppression hearing, but she did review the video from which the transcript was taken at least five times. *Abel*, 2011 WL 5221276, at *1 n. 6.

**5.** *Abel*, 2011 WL 5221276, at *1 (footnote omitted) (citations omitted).

**6.** *Id.* (citations omitted).

**7.** *Id.* at *2 (citations omitted).

**8.** *Id.* at * 1.

On November 7, 2011, the State filed a motion for reargument, wishing to advance arguments under 21 *Del. C.* § 701 and 11 *Del. C.* § 1902.[9] The trial judge denied the State's motion on the grounds that the State failed to raise the arguments both in its papers and at the suppression hearing.[10] On January 3, 2012, the trial judge dismissed the charges. The State now appeals the trial judge's suppression decision.

## II. STANDARD OF REVIEW

■ In general, we review the trial judge's grant of a motion to suppress for an abuse of discretion.[11] To the extent that her decision is based on factual findings, we review those for abuse of discretion.[12] We must adopt her factual findings and her reasonable inferences as long as there is sufficient evidence in the record to support them and the findings are not clearly erroneous.[13] Her factual findings "can be based upon physical evidence, documentary evidence, testimonial evidence, or inferences from those sources jointly or severally."[14] We review *de novo* her legal conclusions concerning the motion to suppress "to determine whether the totality of the circumstances, in light of the trial judge's factual findings, support a reasonable and articulable suspicion."[15]

## III. ANALYSIS

### A. The State is limited to arguing officer safety.

■ Despite the State's "moving target" approach to its briefing, the State is limited to arguing the motion to suppress on the theory of officer safety. Under Supreme Court Rule 8, we decline to address questions that were not fairly presented to the trial judge.[16] As the trial judge noted and the record supports, the State failed to present arguments under 21 *Del. C.* § 701 and 11 *Del. C.* § 1902 during the suppression hearing.[17] Furthermore, State's counsel was asked at oral argument, "Are you relying on officer safety and is the State's position on appeal [the officer] could have patted [Abel] down without asking" about weapons?[18] Counsel responded, "[Y]es. The State's primary theory is that this was a suitable measure for officer safety given the totality of circum-

9. State's Mot. Rearg. ¶¶ 4, 6.

10. *State v. Abel (Abel Order)*, 2011 WL 5925284, at *1 (Del.Super. Nov. 28, 2011) (ORDER) (citing *State Farm Fire & Cas. Co. v. Middleby Corp.*, 2011 WL 2462661, at *2 (Del.Super. June 15, 2011)). The State admitted it had not initially raised issues under 21 *Del. C.* § 701 in its Motion for Reargument. State's Mot. Rearg. ¶ 4. The State fails to mention 11 *Del. C.* § 1902 in its Response to Defendant's Motion to Suppress. App. to Opening Br. A–7 to A–9.

11. *Lopez–Vazquez v. State*, 956 A.2d 1280, 1284 (Del.2008) (citations omitted).

12. *Id.* at 1284–85 (citations omitted).

13. *Id.* at 1285 (citations omitted); *Hudak v. Procek*, 806 A.2d 140, 153 (Del.2002) ("[T]his Court on appeal will test individual findings of fact only to ensure that the factual findings and inferences are supported by 'competent evidence.'" (citation omitted)); *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 491 (Del. 2000) ("In any appeal, the factual findings of a trial judge will not be set aside by a reviewing court unless those factual determinations are clearly erroneous.").

14. *Cede & Co.*, 758 A.2d at 491.

15. *Lopez–Vazquez*, 956 A.2d at 1285 (emphasis added).

16. Supr. Ct. R. 8.

17. *See supra* note 10 and accompanying text.

18. Oral Argument at 8:36, *State v. Abel*, No. 50, 2012 (Del. Oct. 10, 2012), *available at* http://courts.delaware.gov/supreme/audioargs.stm.

stances here." [19] Therefore, the State is limited to its arguments about officer safety.

**B. In light of the trial judge's factual findings, Lloyd could not have possessed a reasonable, articulable suspicion that Abel was armed and dangerous.**

■ In order to justify a pat down on the grounds of officer safety, an officer must have reasonable, articulable suspicion that the person subject to the frisk is presently armed and dangerous.[20] We define "[r]easonable suspicion" as "the officer's ability 'to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant[ ] the intrusion.'" [21] "A pat down ... requires articulable facts *specific to the person* frisked." [22]

■ In order to determine whether reasonable, articulable suspicion exists, we conduct a totality of the circumstances analysis, in light of the trial judge's factual findings.[23] We evaluate "the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts." [24] The question we review is whether, based on the trial judge's findings, an officer in

Lloyd's position could have had a "reasonable[,] articulable suspicion that [Abel was] armed and presently dangerous." [25]

The trial judge found that Lloyd's determination that Abel was speeding, based on Lloyd's testimony that "he paced Abel 'at 80 in a 55,'" justified the initial stop.[26] She found that Abel "initially cooperated" with the stop "by providing his license and registration." [27] She found that: "Abel's hands remained visible almost the entire time, Lloyd never identified a bulge in Abel's vest or pants" that might indicate a weapon, and "all of [Abel's] movements could be easily observed." [28] According to the trial judge, "Abel never exhibited any hostile or aggressive behavior towards Lloyd," and "considering Abel had just been stopped for speeding, the video from Lloyd's dashboard camera depicts Abel as being quite jovial." [29] The stop occurred mid-morning and the trial judge made no finding that Interstate 95 was a high crime area frequented by motorcycle gangs. None of these factual findings are "clearly erroneous" based on the transcripts from the suppression hearing and the video taken during the stop; therefore, they bind us.

The trial judge, despite watching the video at least five times, did not address Abel's statement about "going on a run today." Because she conducted a totality

19. *Id.* at 8:53.

20. *Holden v. State,* 23 A.3d 843, 847 (Del. 2011) (citing *Arizona v. Johnson,* 555 U.S. 323, 326, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009)).

21. *Id.* (quoting *Jones v. State,* 745 A.2d 856, 861 (Del.1999)).

22. *Id.* at 849 (citing *Ybarra v. Illinois,* 444 U.S. 85, 94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1980)).

23. *Id.* at 847.

24. *Jones v. State,* 745 A.2d 856, 861 (Del. 1999) (citations omitted).

25. *Holden,* 23 A.3d at 847 (citing *State v. Henderson,* 892 A.2d 1061, 1064 (Del.2006)).

26. *State v. Abel,* 2011 WL 5221276, at *1, *4 (Del.Super. Oct. 31, 2011).

27. *Id.* at *4.

28. *Id.*

29. *Id.*

of the circumstances analysis and found that "Lloyd never articulated a particularized suspicion that Abel was armed and dangerous aside from Abel's alleged gang membership and his refusal to answer a question about his destination,"[30] we infer that she gave that comment little to no weight. Because we review for abuse of discretion, we infer the same. Both parties stipulated that "Hells Angels Motorcycle Club" is an "Outlaw Motorcycle Gang," (OMG) and that "troopers are aware that OMG members are routinely directed to participate in club events, including mandatory motorcycle rides or 'runs' and these events have been the source of violent encounters involving the use of weapons against other motorcycle clubs."[31] However, the parties dispute whether Abel meant that he was in Delaware on gang business (as opposed to just being out riding his motorcycle) or even whether that gang business might have been innocuous.[32]

Based on the trial judge's factual findings, she correctly noted that the issue is "whether Abel's clothing," denoting alleged gang membership, "coupled with his unwillingness to share his destination," created a reasonable, articulable suspicion that Abel was presently armed and dangerous under the totality of the circumstances" as established by the facts she found.[33] Under 11 *Del. C.* § 1902, Lloyd was permitted to ask Abel about his destination because Lloyd had reasonable grounds to suspect Lloyd was speeding.[34] Lloyd was not obligated to respond,[35] and as the trial judge

---

**30.** *Id.* at *6 (Del.Super. Oct. 31, 2011). We recognize that we must judge the facts "against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (citations omitted). We take the trial judge's comment that Lloyd failed to articulate additional facts to mean that, with Lloyd as the only witness at the suppression hearing, she found no facts giving rise to a particularized suspicion other than the alleged Hells Angels membership and Abel's refusal to tell Lloyd his destination.

**31.** App. to Opening Br. A–9.

**32.** *Compare* Opening Br. at 18, *and* Oral Argument at 7:52, 9:08, *State v. Abel,* No. 50, 2012 (Del. Oct. 10, 2012), *available at* http://courts.delaware.gov/supreme/audioargs.stm ("'I'm out on a run.' Gang speak for 'I'm engaged in business here, I'm engaged in gang business.' [Lloyd] knows [Abel is] in enemy territory.... He knows that in fact Mr. Abel says to him, 'I am on a run.' That is one of those phrases that he uses. And this officer knows on a run means, and if you look that's stipulated to ... that on a run means you're doing gang business and that ... can involve violence and that can involve weapons."), *with* Answering Br. at 26–27, *and* Oral Argu-

ment at 20:35–22:10, 21:45 ("[T]here can be bad gang business; there can be good gang business, but saying 'on a run' doesn't mean 'Aha! that tells me this is bad.' And wouldn't [Abel] be kind of stupid to say to a policeman, given the experiences that Abel has had, 'I don't want to go through that again, been there done that,' that he's going to say, 'And by the way I'm doing some gang business?' "). Even the State's counsel at one point uses the more innocuous term "ride" in place of "run" later in his argument. Oral Argument at 11:12 ("When [Lloyd] says, 'Where are you going?' And then [Abel] says, you know, 'Look, we're just out on a ride, things like that,' and [Lloyd] says, 'Yeah, but ... where?' and [Abel] says 'Well I'm not going to go into all that with you.' I think that is further evidence that he may be involved in activity that he doesn't want the police officer to know about.").

**33.** *State v. Abel,* 2011 WL 5221276, at *5 (Del.Super. Oct. 31, 2011).

**34.** *Caldwell v. State,* 780 A.2d 1037, 1049 (Del.2001).

**35.** *Id.* at 1049 n. 29 (citing *Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain

found, he "politely declined to divulge that information." [36] We agree with the trial judge that while Lloyd was entitled to ask Abel additional questions about his destination, "Abel's refusal did not give Lloyd a reasonable[,] articulable suspicion that Abel was armed and dangerous." [37]

In *Caldwell*, we held that the following three facts did not "justify a reasonably prudent person in believing that Caldwell was armed and dangerous:" [38] "(1) Caldwell's movement of his right arm as he pulled over, (2) Caldwell's apparent nervousness and perspiration, and (3) Caldwell's implausible assertion that he did not know the identity of his passenger." [39] As the trial court aptly noted, "If the police were not justified in *Caldwell* to conduct a pat down where the defendant told an 'implausible story,' a pat down is certainly not justified here." [40]

We next turn to the issue of Abel's affiliation with the Hells Angels. The trial judge noted that "[w]hile the State concedes that the situation that Lloyd encountered when he approached Abel 'would not appear to be all that menacing to the untrained observer,' it asserts that Abel's [Hells] Angels Motorcycle Club vest 'changes everything.' " [41] The State heavily relies on Lloyd's training and experience

with OMGs, and the assertion that "[a] gang member traveling unarmed through a rival gang's territory is subject to a serious risk to [his] safety; consequently, a police officer encountering a Hells Angels member flying colors in Pagans territory faces a heightened concern that the person has access to a weapon." [42] If we agree with the State's position, then the law of Delaware would be that whenever an officer pulls over a Hells Angels member wearing his organization's colors for a traffic violation in the State of Delaware, the officer may frisk the motorcyclist for weapons, because the State of Delaware is rival gang territory. [43]

Our decision in *Walker v. State* [44] is distinguishable. In *Walker*, the following facts supported a finding of reasonable suspicion: (1) the location of the incident in a high crime area; (2) the defendant's "initial flight upon seeing the police car;" (3) the officer's suspicion that the defendant participated in a drug sale; and (4) the knowledge that "drug traffickers often carry deadly weapons." [45] Here, the trial judge made no factual finding that Interstate 95 is a high crime area; moreover, she specifically found that Abel was polite, jovial, and cooperative with Lloyd.

In this specific fact setting, we find the

---

information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.")).

36. *Abel*, 2011 WL 5221276, at *6.

37. *Id.* at *4.

38. *Caldwell*, 780 A.2d at 1051.

39. *Id.* at 1050.

40. *Abel*, 2011 WL 5221276, at *4.

41. *Id.* at *5 (footnote omitted) (citing State's Resp. at 2).

42. App. to Opening Br. A–9.

43. We suppose the Hells Angels member would also have to give an unsatisfactory answer in response to 11 *Del. C.* § 1902 questions, but as he is not required to answer those questions by law, it is difficult to see how that meaningfully adds to the analysis.

44. *Walker v. State*, 610 A.2d 728, 1992 WL 115945 (Del. Apr. 20, 1992) (TABLE).

45. *Id.* at *2 (citation omitted).

reasoning in *State v. Dollard*[46] persuasive. In *Dollard*, "the State concede[d] that the only appreciable threat to 'officer safety' was the [police officer's] knowledge that drug dealers often carry weapons."[47] The interaction took place in a well-lit area, not known to be a "high crime" area.[48] Other officers were on the scene, and the defendant "did not act nervously or otherwise inappropriately, nor did he make any threatening or evasive gestures. There were no obvious signs of a potential weapon on on his person."[49] The officer himself "testified that he conducted a pat-down search of [the defendant] because he believed [the defendant] was a drug dealer, he knew drug dealers often carried dangerous weapons, and it was his police department's policy routinely to conduct pat-down searches of suspected drug dealers."[50]

The Superior Court judge in *Dollard* found that no Delaware case was directly on point, but that other jurisdictions were split: "Some courts have concluded that a police officer's belief that a suspect is a drug dealer along with his knowledge that drug dealers often carry weapons will justify a pat-down search of the suspect; other courts have determined that something more is required before a pat-down search is proper."[51] Ultimately, the judge was convinced "that the more prudent interpretation of *Terry* is to require that an officer base a determination that his safety or that of others is in danger upon more than his belief that the suspect is a drug dealer and his knowledge that drug dealers often carry weapons."[52] She commented that "allowing pat-down searches of suspected drug dealers to be conducted as a matter of routine practice, without other attendant circumstances, would eviscerate *Terry*['s] requirement that the pat-down be based on a particularized suspicion developed by the officer with respect to each individual suspect."[53]

In contrast to *Dollard*, *State v. Miglavs*[54] presents facts that properly give rise to a particularized, reasonable suspicion. The Supreme Court of Oregon affirmed a decision denying defendant's motion to suppress.[55] While the defendant argued "that his cooperative attitude and lack of suspicious behavior was sufficient to dispel any concerns that the officers had for their safety," the court noted that "defendant's attitude and demeanor are just two circumstances that the officers and, ultimately, [the] court must consider."[56] The court identified the combination of factors that "were sufficient to give rise to a reasonable and individualized suspicion that defendant might have posed a safety threat."[57] The court noted that the contact with the defendant "occurred at a late hour in a darkened area in the general vicinity where one of the officers recently had encountered armed members of the

---

**46.** 788 A.2d 1283 (Del.Super.2001).

**47.** *Id.* at 1285–86.

**48.** *Id.* at 1285.

**49.** *Id.* at 1287.

**50.** *Id.*

**51.** *Id.* at 1288 (footnote omitted) (citations omitted).

**52.** *Id.* at 1289.

**53.** *Id.*

**54.** 337 Or. 1, 90 P.3d 607 (2004).

**55.** *Id.* at 614.

**56.** *Id.* at 612 (citing *State v. Ehly*, 317 Or. 66, 854 P.2d 421 (1993)).

**57.** *Id.* at 614 (emphasis omitted).

18th Street gang." [58] The court considered the defendant "uncooperative during the initial investigation when he refused to reveal the location of his residence in the apartment complex." [59] Furthermore, "although defendant was free to move from the immediate area after his identification was returned to him, he chose to remain in the area near where the police were conducting an ongoing investigation," which reasonably heightened the officers' safety concerns.[60]

The court also addressed the defendant's gang-related clothing. While "clothing that announces a gang affiliation does not, by itself, give rise to the kind of individualized suspicion of a safety threat required under Article I, section 9[ of the Oregon Constitution]," "officers reasonably may draw inferences about human behavior from their training and experience." [61] The court found the officers "knew from training and recent personal experience that the gang identified on defendant's shirt operated in the immediate vicinity of the contact and that members of that gang carried weapons," and "one of the officers recently had removed a gun from one of the members of that gang." [62] Relying on those two facts, the court found that the concern for officer safety was "not based solely on generalized or stereotypical information about gang behavior," but rather was particularized because it was "based on specific training about and recent personal experience with a narrowly identified group, *viz.*, members of the local gang to which defendant and his male

companion proclaimed their allegiance and which operated in the area where the officers encountered defendant." [63] That kind of particularized, personal experience is absent in the instant case.

A Sixth Circuit Court of Appeals panel confronted a very similar situation to this case in *United States v. Robinson*, a 2–1 table decision.[64] In *Robinson*, two men in Hells Angels jackets had pulled over on the side of the road because one of the motorcycles was sputtering.[65] Three police officers approached the men, and one of the officers observed a knife sheath on Robinson's companion. When Robinson heard one officer inform the other to pat him down, Robinson then turned over two knives. At that point, the court found, besides the knife and gun found on Robinson's companion, five additional factors: (1) the police officer recognized the Hells Angels as a criminal organization; (2) Robinson and his companion were physically larger than the officers; (3) Robinson and his companion were from out of state; (4) Robinson and his companion informed the officers they were traveling from Chicago to New York (raising concern because Brecksville, Ohio, was not the best route and they were stopped at 6:51 a.m.); and (5) After Robinson's companion informed him that the officers were going to pat down his companion, Robinson took a few steps toward the officer and his companion, but then complied with the officer's instructions to return to his motorcycle.[66] The court found that these five "factors described by the Government, even when

58. *Id.* at 613.

59. *Id.* (citation omitted).

60. *Id.* at 614.

61. *Id.* at 613 (citation omitted).

62. *Id.*

63. *Id.*

64. *United States v. Robinson,* 149 F.3d 1185, 1998 WL 322656 (6th Cir. May 22, 1998) (TABLE)

65. *Id.* at *1

66. *Id.* at *4–5.

taken together, provide little basis for reasonable suspicion that [the defendant] was armed and dangerous." [67] The court affirmed the suppression order because had "the officers based their patdown of [Robinson] on *objectively* reasonable suspicion, rather than, say, prejudice towards motorcycle riders, members of the [Hells] Angels, or people from out-of-state, they must have been relying almost entirely on the fact that a pistol and knife were recovered from" Robinson's companion, which was not a proper justification for the Terry frisk.[68]

■ While concern for "officer safety is both legitimate and weighty, it cannot in all circumstances justify a search or seizure. Otherwise nearly any invasion of a person's privacy could be justified by arguing that the police needed to protect themselves from harm." [69] "Officer safety" is not a talisman, and "the mere incantation of 'officer safety'" does not "provide the necessary reasonable suspicion for a frisk." [70] "The relevant inquiry is 'whether a reasonably prudent man in the circumstances could be warranted in the belief that his safety or that of others was in danger.'" [71] We have commented that, "[g]enerally, a pat down is justified based on the nature of the suspected crime, a sudden reach by the individual, a bulge, or a history with the specific individual." [72] Because we must make our analysis in light of the trial judge's findings,[73] the issue becomes whether Abel's refusal to reveal his destination, combined with his

Hells Angels affiliation, give rise to a reasonable, articulable suspicion under the totality of the circumstances.

■ Abel's affiliation with the Hells Angels does not support a finding of reasonable, articulable suspicion that Abel was armed and dangerous. Lloyd had no personal, particularized experience with Abel, and extremely limited experience with the Hells Angels. At best, Lloyd extrapolated his general suspicions about the Pagans and applied them to Abel. While Lloyd may have believed that the Hells Angels and the Pagans are rival gangs and Delaware is Pagan territory, Abel was traveling on a very busy interstate and Lloyd was aware of no facts that indicated gang activity was occurring nearby. This was mid-morning and not in a high crime area. Abel's failure to reveal his destination, combined with his Hells Angels affiliation, does not catapult this case into one where reasonable, articulable suspicion exists. That is particularly so, given the trial judge's factual finding, gleaned from a real time video of the encounter, that Abel was cooperative, polite, and jovial. As the trial judge noted, "Abel's hands remained visible almost the entire time, Lloyd never identified a bulge in Abel's vest or pants" that might indicate a weapon, and "all of [Abel's] movements could be easily observed." [74] We hold that the facts in this case fail to raise a reasonable, articulable suspicion that Abel was armed and dangerous that would justify

67. *Id.* at *5.

68. *Id.*

69. *Jones v. State,* 745 A.2d 856, 872 n. 78 (Del.1999) (quoting *United States v. Johnson,* 170 F.3d 708, 718 (7th Cir.1999)) (internal quotation marks omitted).

70. *Holden v. State,* 23 A.3d 843, 850 (Del. 2011).

71. *Id.* (quoting *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

72. *Id.*

73. *Lopez–Vazquez v. State,* 956 A.2d 1280, 1285 (Del.2008).

74. *State v. Abel,* 2011 WL 5221276, at *4 (Del.Super. Oct. 31, 2011).

the pat down, and that accordingly, any evidence seized must be suppressed.

## IV. CONCLUSION

We **AFFIRM** the grant of the motion to suppress and, therefore, the judgment of the Superior Court.

RIDGELY, Justice, dissenting, with HOLLAND, Justice, joining:

It is undisputed in this case that there was probable cause to stop Abel for breaking the law. Trooper Lloyd was justified in making a limited warrantless search for the protection of himself if he had a reasonable, articulable suspicion that Abel was armed and dangerous.[75] We are required to apply an objective test to resolve the issue of whether reasonable, articulable suspicion justified a protective search.[76] The level of suspicion necessary to constitute reasonable suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence" and "is obviously less demanding than that for probable cause."[77] The "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."[78]

"[D]ue weight must be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."[79] Ultimate determinations of reasonable suspicion (or lack thereof) are subject to this Court's independent review.[80] Thus, we examine the totality of the circumstances, "as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[81] The totality of the circumstances in this case provided a reasonable, articulable suspicion that Abel was armed and dangerous.

Trooper Lloyd has been a Delaware State Trooper for seven years. He has participated in thousands of traffic stops and has specialized training on outlaw motorcycle gangs. He received daily intelligence briefings which include updates on the activities of outlaw motorcycle gangs. He knew from his training that members of organized, criminal gangs are more likely to assault police officers and that the most active motorcycle gang in Delaware is the Pagans, rivals of the Hells Angels. The parties stipulated that "troopers are aware that OMG [outlaw motorcycle gang] members are routinely directed to participate in club events, including mandatory motorcycle rides or 'runs' and these events have been the source of violent encounters involving the use of weapons against other

75. *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

76. *Id.* at 21–22, 88 S.Ct. 1868.

77. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

78. *Terry,* 392 U.S. at 27, 88 S.Ct. 1868.

79. *Id.*

80. *Ornelas v. U.S.,* 517 U.S. 690, 697–98, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). *See also*

*Lopez–Vazquez v. State,* 956 A.2d 1280, 1285 (Del.2008) ("Where as here, we are reviewing the denial of motion to suppress evidence based on an allegedly illegal stop and seizure, we conduct a *de novo* review to determine whether the totality of the circumstances, in light of the trial judge's factual findings, support a reasonable and articulable suspicion for the stop.")

81. *Jones v. State,* 745 A.2d 856, 861 (Del. 1999) (*citing United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

motorcycle clubs." [82]

Trooper Lloyd witnessed Abel and another Hells Angel travelling 80 m.p.h. in a 55 m.p.h. zone wearing Hells Angels colors in Pagan gang territory. Abel's excessive speed on a motorcycle put at risk not only his own life but also the lives of others on the road. A conviction of driving 25 m.p.h. over the speed limit would require the suspension of his driving privileges in Delaware. [83]

When Trooper Lloyd pulled Abel over, Lloyd was alone and did not have immediate back up. Abel said he was on a "run" but he refused to say where he was going. He explained no emergency circumstances to justify his dangerous speed that put both his life and his driving privileges at risk. His conduct was consistent with being on gang business. While the trial court and the Majority give "little to no weight" to Abel's admission of being "on a run today," that fact is present nevertheless and lends support to Trooper Lloyd's suspicion that Abel was prepared for a violent encounter. Trooper Lloyd knew he would be particularly vulnerable once he returned to his car to do computer inquiries on Abel. He had a reasonable concern for his personal safety that justified a protective search. Abel's motion to suppress should have been denied.

We respectfully dissent.

**Upon Motion for Reargument**

In our original opinion, the majority held that the facts of this case failed to raise a reasonable, articulable suspicion that Defendant-Appellee David Abel was armed and dangerous that would justify a pat down, and, accordingly, affirmed the Superior Court judge's decision to suppress the evidence seized. The dissent disagreed because it believed the Delaware State Trooper had a reasonable concern for his safety that justified a protective pat down.

The State filed a Motion for Reargument or Clarification dated December 20, 2012. Abel filed a response on January 14, 2013. The purpose of this supplemental opinion is to address the Superior Court's judge's determination of when a "second seizure" occurred. [84] After review of the State's motion and Abel's response, we deny the State's Motion for Reargument or Clarification.

 The Superior Court judge erred harmlessly by determining that a second seizure occurred when Trooper Lloyd merely asked David Abel whether he had any weapons on him. [85] In *Murray v. State*, we discussed the U.S. Supreme Court's holding in *Arizona v. Johnson*. [86] Unlike in *Murray*, where the investigation of drug activity occurred after the conclusion of a traffic stop, Lloyd merely asked "Any weapons on ya?" during the traffic stop. [87] The second seizure instead occurred when Trooper Lloyd took action consistent with a pat down. [88]

---

**82.** *State v. Abel*, No. 50, 2012, slip op. at 11 (Del. Dec. 5, 2012) (*quoting* App. to Op. Br. A–9).

**83.** 2 *Del. Admin. C.* § 2208–4.7.2 ("When convicted of driving 25 MPH over the posted limit, the driver's license will be suspended for a mandatory period of 1 month.").

**84.** *See State v. Abel*, 2011 WL 5221276, at *6–7 (Del. Super. Oct. 31, 2011).

**85.** *See id.*

**86.** *Murray v. State*, 45 A.3d 670, 674–75 (Del. 2012) (discussing *Arizona v. Johnson*, 555 U.S. 323, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009)).

**87.** *Id.* at 674.

**88.** *See Arizona v. Johnson*, 555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) (citing *Muehler v. Mena*, 544 U.S. 93, 100–01, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005)) ("An officer's inquiries into matters unrelated to

The trial judge harmlessly erred as a matter of law by failing to recognize the rule of *Arizona v. Johnson*, so we provide this clarification for future guidance. Because the nuance of when the second seizure occurred does not change the outcome of the appeal, we deny reargument. This supplemental opinion modifies the original opinion accordingly.

We **DENY** the Motion for Reargument and **REAFFIRM** the judgment of the Superior Court.

---

the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inqui-ries do not measurably extend the duration of the stop."); *Murray,* 45 A.3d at 674–75 (discussing *Arizona v. Johnson*).