# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| | ) | |
| v. | ) | Crim. I.D. No.: 1710003809 |
| | ) | |
| | ) | |
| BAKR DILLARD, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Submitted: February 22, 2018
Decided: March 16, 2018

*Upon Consideration of Defendant's Motion to Suppress,*
**GRANTED.**

Mark A. Denney, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware. *Attorney for the State.*

Patrick J. Collins, Esquire, Collins & Associates, Wilmington, Delaware. *Attorney for the Defendant.*

**MEDINILLA, J.**

## INTRODUCTION

Defendant Bakr Dillard ("Defendant") filed this Motion to Suppress after he was pulled over in a minivan for operating a vehicle with improper window tint. During the course of this routine traffic stop, an officer called for a K-9 Unit to perform a drug sniff and the canine alerted to the presence of drugs. Defendant argues that the officer conducted a second detention unsupported by reasonable articulable suspicion in violation of the Fourth and Fourteenth Amendments of the United States Constitution, Article I, Section 6 of the Delaware Constitution, and Delaware statutory law. For the reasons that follow, the Court finds that the State failed to meet its burden by a preponderance of the evidence to establish that the officer had sufficient reasonable articulable suspicion to justify the seizure. As such, the Motion to Suppress is **GRANTED**.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

On October 6, 2017, Officer Wilkers and Officer Vignola of the Wilmington Police Department/Operation DISRUPT[2] were traveling in their patrol car and noted a minivan with improper window tint traveling on the 500 block of North Spruce

---

[1] The Court's recitation is based on the testimony of the State's witnesses and/or exhibits presented at the suppression hearing on February 22, 2018.

[2] None of the witnesses for the State recalled what the acronym stood for even after Defense Counsel cross-examined them that it stood for "Dealing with Issues of Stabilization through Respect, Understanding, and Promoting Trust." This is no longer the name of the unit.

2

Street. Before pulling the vehicle over, Officer Wilkers ran a check on the vehicle and saw that it was registered to a person named Rubin Harper of Wilmington. The vehicle did not have a valid window tint waiver so the officer decided to pull the vehicle over to issue a traffic citation. Upon signaling the vehicle to stop, Defendant pulled over immediately at 4th and Lombard. Upon request, Defendant produced a license and registration. A female adult passenger also produced valid identification. Officer Wilkers testified that Defendant's responses and presentation of documents were appropriate. A DELJIS check yielded no issues and Defendant's license also proved valid.

Officer Wilkers asked Defendant to step out of the vehicle so that the officer could ask him additional questions "about the vehicle." Defendant was not handcuffed nor patted-down and instead was asked three questions. First, he was asked who owned the vehicle and Defendant corroborated what was already known to the officer about ownership. Second, when asked where he was coming from, Defendant stated "from around 7th Street." Lastly, Officer Wilkers asked if there was "anything illegal" in the vehicle. Defendant responded "no," and that he would not consent to a search of the vehicle.

Officer Wilkers then ordered Defendant away from the vehicle and directed Defendant to remain on a curb. At this time, another DISRUPT unit, Officers

3

Rosado and Petrucci, showed up "to assist."[3] Officer Wilkers then returned to his vehicle to write the citation for improper window tint.

At the hearing, the State introduced the audiotape exchange between Officer Wilkers and Officer Caez of the K-9 Unit that took place while Defendant was on the curb and Officer Wilkers was in his vehicle issuing the ticket. The exchange was initiated by Officer Wilkers for assistance from Officer Caez's "partner" to perform an open air sniff and asks, "how fast can you get here?" Officer Caez responded that he was approximately three to five minutes away. Officer Caez arrived with the dog to perform the open air sniff, and the K-9 alerted to the passenger door handle.

Officer Wilkers returned to the minivan and opened that passenger door. There was a green plant substance in the interior of the door handle area. Officer Wilkers then opened the center console and observed additional marijuana and a large amount of money. The police stopped the search, transported the vehicle, and obtained a search warrant. In the console, upon execution of the search warrant, police found a firearm, marijuana, a sports lottery ticket, and $11,000 in cash. The police also found forms and documents with Defendant's name on them. Defendant contends that the $11,000 in cash was not his and that he did not sign a property receipt for it. Defendant did sign a property receipt for $472 found on his person.

---

[3] The State did not establish why two more officers were needed to assist for the write-up of a traffic ticket, except to suggest it was DISRUPT protocol.

4

Defendant is charged with Drug Dealing Marijuana; Possession of a Firearm During the Commission of a Felony; Possession of a Firearm by a Person Prohibited; Possession of Ammunition by a Person Prohibited; Possession of a Deadly Weapon with a Removed, Obliterated, or Altered Serial Number; Carrying a Concealed Deadly Weapon; Operating a Vehicle with Improper Window Tinting; and Unauthorized Use of a Motor Vehicle.

Defendant filed this Motion to Suppress on January 22, 2018. The State responded on February 16, 2018 and the hearing took place on February 22, 2018. Having considered all submissions and the arguments of counsel, the matter is ripe for review.

## STANDARD OF REVIEW

On a motion to suppress, as a general rule, "the defendant bears the burden of establishing that the challenged search or seizure violated his rights under the United States Constitution, the Delaware Constitution, or the Delaware Code."[4] "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that

---

[4] *State v. Nyala*, 2014 WL 3565989, at \*5 (Del. Super. July 17, 2014).

the search or seizure was reasonable."[5] As is the case here, the burden is on the State to establish the reasonableness of the seizure by a preponderance of the evidence.[6]

## CONTENTIONS OF THE PARTIES

Defendant argues he was subjected to an impermissible seizure that fits squarely within the holding of the 2001 Delaware Supreme Court decision in *Caldwell v. State*,[7] and aligns on point with the more recent 2015 decisions of this Court in *State v. Stanley*[8] and *State v. Chandler*.[9] Specifically, Defendant argues that Officer Wilkers extended the traffic stop to conduct a drug investigation without reasonable articulable suspicion to support a second detention.

The State counters that there was no second detention. It argues that, unlike *Stanley* and *Chandler* where the traffic ticket had already been issued, here, the officer was still in the middle of conducting the traffic stop when the K-9 Unit arrived to perform the canine sniff. The State thus argues that since the officer was

---

[5] *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). *See also State v. Chandler*, 132 A.3d 133, 139 (Del. Super. 2015), *as corrected* (Del. Super. Apr. 14, 2015) ("On a motion to suppress evidence seized during a warrantless search or seizure, the State bears the burden of establishing that the challenged search or seizure comported with the rights guaranteed by the United States Constitution, the Delaware Constitution, and Delaware statutory law.").

[6] *State v. Abel*, 2011 WL 5221276, at *2 (Del. Super. 2011), *aff'd*, 68 A.3d 1228 (Del. 2012), *as amended* (Jan. 22, 2013).

[7] 780 A.2d 1037 (Del. 2001).

[8] 2015 WL 9010669 (Del. Super. Dec. 9, 2015).

[9] 132 A.3d 133 (Del. Super. Apr. 2, 2015, revised Apr. 14, 2015).

6

still writing up the ticket, he did not require reasonable articulable suspicion because there was no measurable extension of the duration of the stop. In the alternative, the State argues that if the Court finds there was a measurable extension of the duration of the stop, the window tint makes this case different from the other vehicle equipment or traffic violations considered in *Stanley* or *Chandler,* and that this combined with other factors, formed the basis for reasonable articulable suspicion.

## DISCUSSION

The Fourth and Fourteenth Amendments of the United State Constitution and Article I, Section 6 of the Delaware Constitution protect citizens from illegal searches and seizures. A traffic stop constitutes such a seizure on a vehicle and those within the vehicle.[10] As such, the State is required to "demonstrate that the stop and any subsequent police investigation were reasonable in the circumstances."[11] A traffic stop is reasonable under the Fourth Amendment if it is supported by reasonable suspicion or probable cause that a traffic violation has occurred.[12] A

---

[10] *Caldwell,* 780 A.2d at 1045.

[11] *Id.* at 1045–46.

[12] *State v. Rickards,* 2 A.3d 147, 151 (Del. Super. 2010), *aff'd,* 30 A.3d 782 (Del. 2011). *See also Holden v. State,* 23 A.3d 843, 847 (Del. 2011) ("A police officer who observes a traffic violation has probable cause to stop the vehicle and its driver."); *Whren v. United States,* 517 U.S. 806, 810 (1996). Further, "[t]he case law in Delaware is clear that while probable cause will serve as the basis for a traffic stop, only a reasonable articulable suspicion of criminal activity is required." *State v. Ellerbe,* 2014 WL 605481, at *3 (Del. Super. Jan. 27, 2014).

traffic stop must be "justified at its inception by reasonable suspicion of criminal activity."[13]

A police officer who observes a traffic violation therefore has probable cause to stop the vehicle and detain the driver. However, once stopped, "[t]he scope and duration of the detention must be reasonably related to the initial justification for the stop."[14] The detention must not extend beyond the time reasonably necessary to effectuate the purpose of the stop—i.e. the point at which the legitimate investigative purpose of the stop is completed.[15] Any additional investigation "beyond that required to complete the purpose of the traffic stop constitutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion."[16] If police prolongs a traffic stop in order to investigate other possible crimes beyond the original traffic offense, the stop becomes a second detention.[17]

Since the State argues there was no second detention, the Court will consider this issue first.

---

[13] *Caldwell*, 780 A.2d at 1046.

[14] *Holden*, 23 A.3d at 847.

[15] *Caldwell*, 780 A.2d at 1046–47.

[16] *Id.* at 1047.

[17] *Id.*

### *Duration and Scope of the Traffic Stop*

Delaware law provides that the duration and scope of the traffic stop must last only as long as reasonably necessary to effectuate the purpose of the stop, at which point the legitimate investigative purpose of the traffic stop is completed.[18] Here, there is no dispute that the stop for improper window tint was proper since the officer knew even before he pulled the vehicle over that it did not have a valid tint waiver.

Under 11 *Del. C.* § 1902, the officer was also permitted to ask the driver for his name, where he was coming from, his destination, and the reason for his trip. These questions are appropriate within a reasonable investigation of the traffic stop. The officer was well within his authority to conduct the routine checks associated with a traffic stop, including to check Defendant's license and conduct the appropriate background checks through DELJIS. The responses from Defendant were appropriate and his DELJIS check was valid.

The officer then asks Defendant to step out of the vehicle to ask him three questions. Under *Loper,* it was also well within legal bounds to request that Defendant step out of the vehicle.[19] Furthermore, under *Arizona v. Johnson*, the United States Supreme Court held that "[a]n officer's inquiries into matters unrelated

---

[18] *Caldwell*, 780 A.2d at 1046–50.

[19] *See Loper v, State*, 8 A.3d 1169, 1173 (Del. 2010) (holding that asking a passenger to exit the vehicle were not beyond the scope of a routine traffic stop).

to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."[20] The officer's questions regarding the vehicle ownership and where Defendant was coming from were also appropriate. However, under *Caldwell*, "[t]he duration and execution of a traffic stop is necessarily limited by the initial purpose of the stop"[21] and that "any investigation of the vehicle or its occupants beyond that required to complete the purpose of the traffic stop constitutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion."[22]

The State argues that Officer Wilkers' last inquiry whether there was "anything illegal" in the vehicle is commonplace and routinely asked by police officers, and should be treated no differently than when a person is asked to step out of a vehicle. An exit command from a vehicle has been considered lawful under *Loper* and other cases that have addressed officer safety during traffic stops, and considered a *de minimis* intrusion.[23] Yet the justification found in cases such as

---

[20] *Arizona v. Johnson*, 555 U.S. 323, 325 (2009).

[21] *Caldwell*, 780 A.2d at 1047 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)).

[22] *Id.* (citing *Ferris v. State*, 735 A.2d 491, 499 (Md. 1999)).

[23] *See Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977) (holding that the order to get out of the car, issued after the respondent was lawfully detained, was reasonable, and thus permissible under the Fourth Amendment where the justification for such order—the officer's safety—is both legitimate and weighty, and the intrusion into respondent's personal liberty occasioned by the

10

*Mimms* and *Loper* contemplate the officer's ability to ask questions regarding officer safety. Defendant was not patted down for weapons when he stepped out of the vehicle such that officer safety was of concern.

Our Supreme Court addressed a similar question in *Pierce v. State*[24] to determine if the officer's questions regarding destination, origination, and weapons and contraband, rose to the level of a "second detention." There, the trial court had determined that after the officer observed nervous behavior on the part of both defendant and his passenger, the officer's inquiry if there were "any weapons, any illegal substances in the vehicle" was a routine question asked as part of an initial traffic stop, and therefore, *the question itself* did not constitute a "second detention."[25] The Supreme Court affirmed and held that Defendant could not demonstrate error in the trial court's factual finding that the question was considered part of a routine stop.[26] However, the Supreme Court interjected that even if the "contraband question" was not routine, there was sufficient reasonable articulable

order, being, at most, a mere inconvenience, cannot prevail when balanced against legitimate concerns for the officer's safety).

[24] 19 A.3d 302, 2011 WL 1631558, at *2 (Del. 2011) (TABLE) (an officer's question about whether there was any contraband in the vehicle during a traffic stop did not constitute a second investigative detention because it was a question the officer routinely asked as part of a traffic stop and was being done contemporaneous to routine traffic stop).

[25] *Id.*

[26] *Id.*

suspicion to ask the question where the Defendant and his passenger exhibited stuttered speech, nervous behavior, inconsistent statements regarding destination and origination and refused to make eye contact.[27] The officer in *Pierce* made initial observations of both Defendant and his passenger that gave rise to reasonable suspicion when he asked his question regarding contraband or weapons.

Officer Wilker's question if there was "anything illegal" in the vehicle is broader than *Pierce* and the timing of when the question was asked is also distinguishable. Unlike a question regarding weapons, which would focus on the officer's safety, this question did not ask a narrow question about weapons or contraband. It asked about the universe of illegal things that may be contained in the vehicle. Asking whether there is something illegal in the vehicle invites a yes or no answer. If yes, then the admission of criminal wrongdoing would have likely led Defendant to voluntary consent to a search of the vehicle, as was obtained in *Pierce*. If the answer is no, as here, the officer conceded during his testimony that since he did not get consent, he took further steps and decided to call in the K-9 Unit.

Because of the events that followed, and for purposes of this analysis, this Court need not consider whether the third question amounted to a "second detention," but this decision should not be read as aligning with *Pierce* to suggest

---

[27] *Id.* at *2 n.14.

that the question is acceptable as part of a routine traffic stop. As noted, the facts in this case are different not only in the timing and the scope of the question, but also because here the officer decided to call in another police unit.

### Calling the K-9

Under *Caldwell* "[e]ven where the traffic stop is *not formally terminated* by the issuance of a citation or warning, 'the legitimating *raison d'etre* [of the stop may] evaporate if the pursuit is unreasonably attenuated or allowed to lapse into a state of suspended animation.'"[28] Whether a detention is "unreasonably attenuated" requires a fact-intensive inquiry.[29] Although questions unrelated to the initial justification for the stop might not *per se* require reasonable suspicion or consent to further question, the Delaware Supreme Court has made clear that such inquiries must not measurably extend the duration of the stop.[30]

The State argues there was no second detention because there was no measurable extension of the duration of the stop where the officer was still issuing the citation when the dog showed up within minutes of his making the call to the K-9 Unit. The State argues that as long as the officer was working on his traffic-related

---

[28] *Id.* at 1048 (quoting *Charity v. State*, 753 A.2d 556, 572 (Md. Ct. Spec. App. 2000))(emphasis added).

[29] *Id.*

[30] *Murray v. State*, 45 A.3d 670, 675 (Del. May 14, 2012, revised July 10, 2012) ("for something to be measurable it need not be large . . . .").

task (issuance of the ticket), the contemporaneous exercise of the dog sniff that took place did not extend the original detention because it was related to the duration of the original stop.

In the 2015 decision of *Rodriguez v. United States*,[31] the Supreme Court of the United States reiterated that a traffic stop prolonged beyond the stop's "mission" is unlawful.[32] The Court identified the "[t]he critical question" as "not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—the stop.'"[33] This measure need not be large.

Here, while processing the ticket for this vehicle violation, this Court heard an audio recording where Officer Wilkers took the additional step—and time—to make a call to Officer Caez and call for K-9 assistance. He asks Officer Caez how fast he can get to his location and that he needs Caez's canine partner to conduct a sniff. Officer Caez responds that he is only several minutes away. This means that

---

[31] *Rodriguez v. United States*, 135 S.Ct. 1609 (2015) (holding that absent reasonable suspicion, police may not extend an otherwise-completed traffic stop in order to conduct a dog sniff because it violates the Constitution's shield against unreasonable seizures.)

[32] *Id.* at 1616 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (holding that a dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment). *See also, id.* at 1615 (quoting *Indianapolis v. Edmond*, 531 U. S. 32, 40–41 (2000)) ("A dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'").

[33] *Id.*

Officer Wilkers has to wait for the K-9 Unit. Further, unlike in *Illinois v. Caballes*,[34] where the Supreme Court of the United States accepted that a K-9 Unit arrived unsolicited and as part of the routine highway stop,[35] here, the K-9 Unit was called to the scene by the officer. No evidence was presented by the State that this K-9 was part of this routine stop. Thus, Officer Wilkers detoured from his task of issuing the ticket to make the call to Officer Caez and wait for the K-9 Unit to arrive. This Court considers this a measurable extension of the initial stop.

The State's argument that because the officer was expeditiously working on both at the same time and thus no reasonable articulable suspicion was required lacks merit, especially where the officer made his intent clear. Two other officers had already arrived on the scene when Officer Wilkers decided to call for Officer Caez. The purpose of the call was not to have four officers—and a dog—assist with issuing a traffic ticket. Officer Wilkers testified that he called for a "Title Dog," a reference to Title 16 of the Delaware Code, and that the intent was to have the canine sniff for drugs. He testified and acknowledged that this particular dog, "Storm," was not able to detect for weapons, but *only drugs*. In *Rodriguez,* the Supreme Court of the United States considered the distinction and significance of K-9 involvement and

_____

[34] 543 U.S. 406 (2005).

[35] *Id.* at 406.

15

identified that unlike the safety concern identified in *Mimms*, "[h]ighway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular."[36] A dog sniff "is not an ordinary incident of a traffic stop . . . . Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission."[37]

On this record, this Court finds the purpose for the traffic stop ended when Officer Wilkers decided to call for a Title 16 dog to conduct an open air sniff of the vehicle. This call, as the officer conceded, was no longer related to the task of issuing a citation for improper window tint and the request for an open air sniff obviously changed the scope of his investigation from a traffic stop into a drug investigation.

The State fails to meet its burden that the additional call for K-9 assistance was within the duration or scope of the initial stop. Because the officer prolonged the traffic stop solely to investigate drug related criminal activity, the traffic stop ended and became a second detention. That second detention was required to be based on specific and articulable facts which, taken together with all rational

---

[36] *Id.*

[37] *Id.* at 1615.

inferences, raise an objective suspicion of criminal behavior.[38] Therefore, the State needs to show that there were facts to support reasonable suspicion for the second detention/drug investigation to justify the calling of the K-9 Unit.

### *No Reasonable Suspicion for the Extended Detention*

The question is whether Officer Wilkers possessed a reasonable articulable suspicion that criminal activity was afoot to further extend the detention to call the K-9 Unit based on the facts presented. "Reasonable suspicion" is a less exacting standard than "probable cause." Officers must be able to identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the belief that a crime is being or has been committed."[39] Whether reasonable suspicion existed must be evaluated in light of "the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[40] A reviewing court should "defer

---

[38] *Id.* at 1616–17 (since the canine sniff was beyond the time the officer needed to issue the written ticket, the Court then remanded the case to the Eighth Circuit to consider whether there was reasonable suspicion that justified detaining the driver beyond completion of the traffic infraction investigation).

[39] *Quarles v. State*, 696 A.2d 1334, 1337 (Del. 1997). Delaware has codified this standard for investigatory stops and detentions in 11 *Del. C.* § 1902, which requires that a police officer have "reasonable ground to suspect a person is committing, has committed, or about to commit a crime" before he may stop and detain a person.

[40] *Jones v. State*, 745 A.2d 856, 861 (Del. 1999).

17

to the experience and training of law enforcement officers."[41]  However, the Court should not consider a police officer's subjective opinion regarding reasonable suspicion and must consider the facts under an objective standard.[42]

Notably, Officer Wilkers testified that he did not form reasonable articulable suspicion until *after* the dog detected a "hit" on the vehicle's door.[43]  Regardless, the test requires an objective analysis.  The reasonableness of official suspicion must be measured by what the officer knew *before* he seized the defendant.[44]  "An illegal stop cannot be justified by circumstances that arose after its initiation."[45]

Defendant pulled over when directed without incident.  His driving did not cause concern.  He produced valid documents.  A DELJIS check revealed no issues.  Defendant did not exhibit any signs of nervousness or provide inconsistent or false answers to the officer.[46]  There was no palpable odor of alcohol or drugs emanating

---

[41] *Woody v. State*, 765 A. 2d 1257, 1262 (Del. 2001) (citing *Jones*, 745 A.2d at 861).

[42] *State v. Chandler*, 132 A.3d 133, 141 (Del. Super. Ct. 2015) (citing *State v. Miliany-Ojeda*, 2004 WL 343965, at *3 (Del. Super. Feb. 18, 2004)).

[43] The State suggested that Officer Wilkers was "being modest" in his testimony that he actually had probable cause at that point.  Modesty or not, Officer Wilkers testified as he did.

[44] *Id.* ("If an officer attempts to seize someone before possessing reasonable and articulable suspicion, that person's actions stemming from the attempted seizure may not be used to manufacture the suspicion the police lacked initially.").

[45] *Woody*, 765 A.2d at 1263.

[46] *Contra State v. Chandler*, 132 A.3d 133, 149 (Del. Super. 2015) (where court found officer did not have reasonable articulable suspicion to extend detention where defendant had multiple cell phones in plain view, gave inconsistent answers, was unable to provide details about his

18

from the vehicle, his person or passenger. When asked to step out of the vehicle, there were no issues of officer safety since he was not patted down. He answered the questions appropriately while outside of the vehicle. When instructed to sit on the curb, Defendant complied. Officer Wilkers stated he therefore relied on the facts that the Defendant was not the owner of a vehicle with improper window tint, that he was coming from "around 7th Street," and the officer's knowledge of a prior unrelated arrest. Only those facts known to a police officer prior to a seizure may be part of the reasonable suspicion analysis.[47]

The officer's knowledge of Defendant's criminal history can be a factor of reasonable suspicion to detain an individual.[48] However, such history, by itself, is insufficient to establish reasonable suspicion.[49] Here, the Defendant's relevant "criminal history" was rather an *arrest* that this officer had made involving a high stakes crap game, and the arrest was not drug-related. An aggregate $25,000 was seized in connection to that arrest which involved several individuals, including Defendant. The officer suggests that even though the arrest was not drug-related

destination, was extremely nervous, had an alias, an extensive criminal history, and was driving a rental vehicle).

[47] *Jones*, 745 A.2d at 874.

[48] *Monroe v. State*, 913 A.2d 570, 2006 WL 3482182, at *2 (TABLE).

[49] *Id.*

19

and Defendant's portion was significantly less than the total amount, through his training and experience, this money amount is generally associated with drug-related activity. The State argues that the holding in *State v. Brady*[50] supports that this Court should give great weight and deference to the officer's knowledge and training in the totality of the circumstances analysis. *Brady* is distinguishable for different reasons.

The *Brady* defendant was a probationer with a history and familiarity with the officer, such that various known violations of his probation were observed by the officer to establish the facts he relied upon for reasonable articulable suspicion. The officer knew that defendant did not possess a license and yet was observed driving. The *Brady* defendant became combative and admitted to using heroin, was observed past curfew, and again resisted police contact. The Supreme Court reversed the trial court's granting suppression where the facts supported a finding of reasonable articulable suspicion to justify the police conduct of the second seizure. Here, the handful of facts available to Officer Wilkers pale in comparison. Defendant was not a probationer observed committing known violations of his probation. The DELJIS run proved valid. Here, there was no evidence of combative or violent criminal behavior on the part of Defendant, or any admission of wrongdoing. That he knew

---

[50] 152 A.3d 140, 2016 WL 7103408 (Del. 2016) (TABLE).

Defendant from a prior unrelated drug arrest that the officer thought *may* be drug-related was merely a hunch.

The second factor was Defendant's response that he was coming from "around 7th Street," known to the officer as a high-crime area. Although the State argued that this was a factor that could be considered, Officer Wilkers actually testified that he did not consider this factor in his consideration of reasonable suspicion, except to say that he knew it was a high-crime area. The fact that Defendant was coming from a high-crime area without more is insufficient.

The officer further testified that he was satisfied with Defendant's response about who owned the vehicle, especially since it actually was corroborated by what he already knew about the vehicle. Similarly, in *State v. Passerini*,[51] the Court of Appeals of Nebraska found that under the totality of the circumstances, police officers did not have reasonable suspicion to justify a prolonged detention.[52] Although that case involved a rental vehicle, that court noted that "[t]he fact that [the defendant] was driving a rental vehicle is perfectly consistent with law-abiding activity, and furthermore, the matching names on the driver's license and rental agreement, coupled with the consistency of [the defendant's] story as to the timeframe of the trip . . . should have dispelled, rather than created, further

---

[51] *State v. Passerini*, 789 N.W.2d 60, 71 (Neb. Ct. App. 2010).

[52] *Id.* at 71.

21

suspicion."[53] So too, here, the officer had already checked out who the owner of the vehicle was before making the stop. Defendant confirmed that he was not the owner of the vehicle. This should have dispelled suspicion, as the answers were consistent with what the officer already knew prior to the traffic stop.

Finally, the State argues that because it is known by law enforcement that window tint is used to conceal weapons and guns, that the window tint supplied the reasonable suspicion to call the K-9 Unit. It argues that the officer's authority to call in the K-9 Unit was reasonable because, unlike the motor vehicle violations of speeding or equipment violations found in *Chandler* and *Stanley*, respectively, "[w]indow tint is different from other equipment violations or even a moving infraction in that reasonable police officers know invalid, unapproved tint to be associated with the concealment of drugs or weapons or both."[54]

Window tint in and of itself does not seem to have the import described by the State. Until relevantly recently, it was even unclear whether an officer's general observation of excessive window tint/being unable to see the occupants inside provided the requisite reasonable suspicion to pull over someone for the corresponding equipment violation. Recent cases such as *State v. Moore*[55] and *State*

---

[53] *Id.* at 70 (noting that the defendant had valid driver's license and a vehicle properly rented in his name, both of which were facts that weighed against the finding of reasonable suspicion).

[54] State's Resp. at 4.

[55] 2017 WL 1040709 (Del. Super. Mar. 16, 2017).

*v. Cannon,*[56] have helped clarify this area, in describing how a dark tint without a medical waiver provides reasonable suspicion for a possible window tint violation, even if the officer is not aware of the exact 70% or more light transmission standard.[57] Nowhere in these opinions does a court reference window tint and the connection to possible drugs and/or weapons. In fact, the case law on window tint was originally so convoluted because the statute/standards on window tint refer to the necessary degree of transparency or visibility for the driver to see *out* the window, not for officers to see *in* and other "virtually incomprehensible" safety concerns.[58] This Court is not convinced that a minivan with improper window tint triggers a call for the K-9 Unit without other telling factors that were present in cases such as *Caldwell,*[59] *Chandler,*[60] or *Stanley,*[61] and still did not give rise to reasonable articulable suspicion.

Therefore, based on the totality of the circumstances, and on this record, it cannot be said that Officer Wilkers had reasonable articulable suspicion that

---

[56] 2017 WL 1277677 (Del. Super. Mar. 30, 2017).

[57] *Cannon,* 2017 WL 1277677, at *4; *Moore,* 2017 WL 1040709, at *4.

[58] *Cannon,* 2017 WL 1277677, at *2 (citing *State v. Wilson,* 2013 WL 2423094, at *2 (Del. Super. Mar. 12, 2013)).

[59] *Caldwell,* 780 A.2d at 1050–51.

[60] *Chandler,* 132 A.3d at 143–49.

[61] *Stanley,* 2015 WL 9010669, at *4.

Defendant was engaging in drug-related criminal activity to justify the second detention and to call the K-9 Unit. This Court finds that the State fails to meet its burden that the officer had the requisite reasonable articulable suspicion to detain Defendant to conduct a drug investigation. Therefore, the evidence found as a result of the second detention must be suppressed.

## VI. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is **GRANTED.**

**IT IS SO ORDERED.**

_____
Vivian L. Medinilla, Judge

oc:    Prothonotary
cc:    Patrick J. Collins, Esquire
       Mark A. Denney, Deputy Attorney General
       Defendant
       Office of Investigative Services