STATE of Delaware

v.

Antoine DOLLARD, Defendant.

No. 0004006790.

Superior Court of Delaware,
New Castle County.

Submitted: Dec. 27, 2000.
Decided: Jan. 11, 2001.

Joelle M Wright, Deputy Attorney General, Wilmington, for State.

Kevin J. O'Connell, Wilmington, for Defendant.

SLIGHTS, J.

Defendant, Antoine Dollard ("Dollard"), was arrested on April 11, 2000, and subsequently charged with one count of Possession With Intent To Deliver Cocaine in violation of 16 *Del. C.* § 4751, and one count of Possession of Drug Paraphernalia in violation of 16 *Del. C.* § 4771. Dollard has moved to suppress all evidence seized from him prior to his arrest, and any statements taken from him thereafter. Dollard raises three arguments in support of his motion. First, he argues that he was stopped and detained without probable cause or reasonable suspicion to believe that he had committed a criminal offense. Second, he argues that the search of his person after the unlawful stop exceeded the permissible scope of a protective search for weapons in violation of *Terry v. Ohio*[1]. Finally, he argues that evidence detected during the pat-down search was unlawfully seized from him. For the reasons that follow, the Court concludes that the search of Dollard and seizure of evidence by the police was unlawful under the Fourth Amendment to the United States Constitution, Article I, § 6 of the Delaware Constitution, and Delaware statutory law. Accordingly, the Motion to Suppress must be GRANTED.

## I. FACTS

On the evening of April 11, 2000, Detective Jones of the Delaware State Police, working in collaboration with other law enforcement agencies as part of the Governor's Task Force, coordinated and then witnessed a telephone call between a confidential informant and an individual referred to by the confidential informant during the conversation as "Twan." The telephone call was initiated after the confidential informant advised Detective Jones

---

1. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

that he could arrange for the purchase of cocaine from "Twan", an individual who purportedly sold narcotics in the Wilmington Manor area of New Castle County. Wilmington Manor is an area known to law enforcement to be the site of regular drug activity.

The confidential informant dialed a pager number in Detective Jones' presence and, at the appropriate prompt, input a telephone number designated by Detective Jones for the return telephone call. The return call was received almost immediately thereafter and Detective Jones listened as the confidential informant arranged for a drug transaction to occur in the parking lot of the Appleby Apartments in New Castle County. Detective Jones heard the confidential informant confirm with "Twan" that the transaction was to occur at a specific location in the parking lot "near the dumpsters" just off Wilton Boulevard.

Detective Jones responded immediately to Appleby Apartments with another member of the Governor's Task Force, Officer Dougherty of Probation and Parole, in order to meet with the target of their investigation and complete the drug transaction. Apparently, the target had never met the confidential informant. Accordingly, Officer Dougherty was to pose as the purchaser of the drugs. Officer Dougherty testified that upon her arrival at the parking lot she went to the area designated by "Twan" and waited for him to arrive.

The Appleby Apartments complex is not located in Wilmington Manor and is not in an area known by officers to be frequented by drug dealers, or otherwise to be a "high crime" area. The designated site for the transaction was a fenced-in dumpster area which, according to both Detective Jones

and Officer Dougherty, was well lit and located in the front of the apartment complex. Approximately ten minutes after Officer Dougherty's arrival, she observed Dollard exit one of the apartment buildings near the dumpster area. According to Officer Dougherty, Dollard approached her and inquired whether she "had the money." Officer Dougherty indicated that she needed to retrieve the money from her car. Upon returning to her vehicle, Officer Dougherty advised Detective Jones of her conversation with Dollard and Detective Jones then accompanied her back to the dumpster area to confront Dollard.

Detective Jones testified that he immediately identified himself as a police officer upon confronting Dollard with the intention of conducting a further investigation into Dollard's potential drug dealing. What he intended to do by way of further investigation, however, is not clear. It is clear that, for reasons not made known to the Court, Detective Jones did not intend to complete the drug transaction with Dollard and did not do so.[2] Detective Jones also testified that he did not intend to arrest Dollard unless his investigation revealed further evidence of a crime. According to Detective Jones, he immediately searched Dollard upon confronting him out of a concern for "officer safety" because his experience has taught him that "drug dealers often carry weapons." Detective Jones testified that this practice is in keeping with Delaware State Police standard operating procedure with respect to any individual suspected of selling drugs. Dollard made no threatening gestures, nor did Detective Jones or Officer Dougherty observe any bulge in Dollard's jacket or pants pockets that might indicate he was carrying a weapon. Instead, the State

2. This fact is particularly perplexing to the Court. Had Detective Jones simply allowed the transaction to proceed to conclusion, and then arrested Dollard, it is unlikely that the State would have been confronted with this Motion to Suppress.

concedes that the only appreciable threat to "officer safety" was Detective Jones' knowledge that drug dealers often carry weapons.

During Detective Jones' "pat-down" of Dollard he felt what he believed to be a plastic baggie which contained a "hard substance." Detective Jones testified that the "baggie/hard substance" combination has a "distinct feeling" which he immediately associates with packaged cocaine. Detective Jones reached into Dollard's pocket and retrieved a plastic baggie, the contents of which later tested positive for cocaine. Dollard was immediately arrested. Thereafter, he apparently made certain incriminating statements, the specifics of which have not been identified by either the State or the defendant.

## II. DISCUSSION

■■■ On a Motion to Suppress, the Defendant bears the burden of establishing that the challenged search or seizure violated the rights guaranteed him by the United States Constitution, the Delaware Constitution, or Delaware statutory law.[3] The burden of proof on a motion to suppress is proof by a preponderance of the evidence.[4] Here, Dollard argues that evi-

dence of the drugs seized from him should be suppressed because it is the product of an illegal detention and search. It is Dollard's burden to prove that he is entitled to relief.[5]

### A. The Investigatory Stop

■■■ Dollard contends that Detective Jones had no legally justifiable basis to stop him.[6] In order to justify his investigatory stop, Detective Jones must have had a reasonable articulable suspicion that a crime had just been, was being, or was about to be committed.[7] In evaluating the officer's conduct, the Court must consider the "totality of the circumstances."[8]

■■■ The facts of record clearly support the reasonableness of Detective Jones' suspicion that Dollard was in the process of committing a crime. Detective Jones had arranged and then witnessed the conversation between his confidential informant and an individual identified by the confidential informant as one who regularly engages in the sale of narcotics. During this conversation a drug transaction was arranged to occur at a designated location. Detective Jones then immediately responded to that location with Officer

---

3. *State v. Huntley*, Del.Super., I.D. No. 9810003443, 2000 Del.Super. Lexis 110, Babiarz, J. (Feb. 18, 2000) (Mem. Op.) (citations omitted).

4. *State v. Bien–Aime Smalls*, Del.Super., Cr. A. No. IK92–08–326, 1993 WL 138719, 1993 Del.Super. Lexis 132, Toliver, J. (March 17, 1993) (Mem. Op.) (citations omitted).

5. *Id.*

6. In Delaware, the appropriate inquiry is whether the officer had a "reasonable ground" to "seize" the defendant. 11 *Del. C.* § 1902(a); *Jones v. State*, Del.Supr., 745 A.2d 856, 861, 869 (1999) (holding that Section 1902(a) establishes the same standard of reasonableness as established in *Terry*, that the

Delaware Constitution provides a broader protection against "seizure" of a suspect than the United States Constitution and that the appropriate inquiry to determine if a suspect was "seized" by the police is whether "the police officer's actions" would cause "a reasonable person [to believe that] he or she was not free to ignore the police presence"). Here, both sides agree that Dollard was "seized" by Detective Jones for purposes of analysis under the Delaware Constitution.

7. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *Robertson v. State*, Del.Supr., 596 A.2d 1345, 1350 (1991).

8. *Id.* (Citing *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

Dougherty and once there observed an encounter between Officer Dougherty and Dollard. Officer Dougherty advised Detective Jones that Dollard had asked her for money. The location of this solicitation—a dumpster area adjacent to an apartment complex—is not an area where one reasonably would expect legitimate commerce to occur. With this information in hand, Detective Jones had a reasonable, articulable suspicion that Dollard was in the process of committing a crime: the sale of illegal drugs. Detective Jones was justified in conducting a so-called *"Terry* stop" of Dollard under these circumstances.[9]

## B. The Pat–Down Search

■ Detective Jones did not stop his investigation with the detention of Dollard. Rather, he continued his investigation by conducting a pat-down search of Dollard almost immediately upon encountering him. To justify this pat-down search, Detective Jones could not rely simply upon the reasonable, articulable suspicion that Dollard was committing a crime. In order for Detective Jones' pat-down of Dollard to withstand constitutional scrutiny, he must also reasonably have believed that Dollard was armed and dangerous.[10]

Detective Jones evidenced his understanding of the standard by which the legality of his pat-down search of Dollard would be measured when he testified that he conducted the pat-down for "officer safety." Nevertheless, the Court must an-

alyze the factual basis upon which Detective Jones determined that the pat-down was necessary. The testimony reveals that Detective Jones encountered Dollard with Officer Dougherty at his side. The "dumpster area" adjoining the Appleby Apartments was well-lit and located in the front of the apartment complex just off a public street. Back up units had responded to the scene to surveil the transaction. Detective Jones acknowledged that Dollard did not, by his conduct, give the officers any reason to be concerned for their safety. Specifically, Dollard did not act nervously or otherwise inappropriately, nor did he make any threatening or evasive gestures. There were no obvious signs of a potential weapon on his person. Instead, Detective Jones testified that he conducted a pat-down search of Dollard because he believed Dollard was a drug dealer, he knew drug dealers often carried dangerous weapons, and it was his police department's policy routinely to conduct pat-down searches of suspected drug dealers.

The State contends that Dollard's status as a suspected drug dealer provided Detective Jones with a sufficient basis under *Terry* and its Delaware progeny to conduct the pat-down. Dollard strongly disagrees with the State's contention in this regard. He argues that the officer must be aware of or observe something more specific to the suspect (e.g. a threatening gesture, an obvious indication of a potential weapon in the suspect's pocket, nervous or inappro-

9. *See, Walker v. State,* Del.Supr., No. 307, 1991, 610 A.2d 728, 1992 WL 115945, Moore, J. (1992) (ORDER) (Court concluded that an investigatory stop was appropriate after the police officer observed a transaction of some kind occur in an area known to be frequented by drug dealers).

10. *Terry,* 392 U.S. at 24, 88 S.Ct. 1868; *State v. Doleman,* Del.Super., Cr. A. Nos. IK94–08–

0303–IK94–08–0305, 1995 WL 339184, 1995 Del.Super. Lexis 235, Ridgely, P.J., at * 5 (April 21, 1995) (Mem. Op.) ("a pat-down for weapons is warranted under *Terry* if a reasonably prudent person in the same circumstances would believe that his safety or that of others was in danger") (citing *Robertson,* 596 A.2d at 1352).

priate behavior, etc.) to justify a pat-down search.

Contrary to the State's assertion, the Court's research has not revealed any Delaware decision directly on point with respect to this issue.[11] The Court has located several decisions from other jurisdictions, however, which do address the issue, albeit with conflicting results. Some courts have concluded that a police officer's belief that a suspect is a drug dealer along with his knowledge that drug dealers often carry weapons will justify a pat-down search of the suspect;[12] other courts have determined that some-

thing more is required before a pat-down search is proper.[13]

■ *Terry* and its United States Supreme Court progeny support the notion that a pat-down search for weapons must be based upon an individualized assessment of the danger confronting the police officer as opposed to generalities and assumptions. For instance, in *Terry*, the Court emphasized that the officer's determination of dangerousness could not be based upon "his inchoate and unparticularized suspicion or hunch," but rather must be based on specific reasonable inferences which he is entitled to draw from the facts in light of his experience.[14] In a compan-

---

**11.** The State has argued that *Walker v. State, supra*, stands for the proposition that a police officer's belief that a suspect is a drug dealer and knowledge that drug dealers often carry weapons is sufficient to justify a pat-down search. The Court disagrees with the State's reading of *Walker*. In that case, the police officers testified that they were in fear for their safety. It was determined that this fear was reasonable in light of the location of the incident (a high crime area) and the suspect's initial flight upon seeing the police car. These observations were in addition to the officer's belief that the suspect had just been involved in a drug transaction and their knowledge that drug dealers often carry deadly weapons. *Id.* at **2. Based on the totality of these circumstances, the Court agreed that the officers were reasonable in their belief that their safety or that of others was in danger. *Id.* The Court did not conclude, however, that the officers' belief that the suspect was a drug dealer and their knowledge that drug dealers carry weapons, standing alone, was sufficient to justify the pat-down search.

**12.** *See e.g., United States v. Sinclair*, 4th Cir., 983 F.2d 598 (1993) (proper to frisk suspected supplier of local drug dealer given local law enforcement "experience with drug traffickers"); *United States v. Salazar*, 2d Cir., 945 F.2d 47 (1991)(stressing that "police know that narcotics dealers frequently carry weapons"); *United States v. Salas*, 9th Cir., 879 F.2d 530 (1989) (proper to frisk one reasonably considered to be a "narcotics dealer"); *United States v. Gilliard*, 1st Cir., 847

F.2d 21 (1988)(firearms "tools of the trade" of drug traffickers); *United States v. Pajari*, 8th Cir., 715 F.2d 1378 (1983) (frisk of suspected major narcotics dealer proper); *Carmouche v. State*, Tex.Crim.App., 10 S.W.3d 323 (2000) (frisk justified because of defendant's "suspected activities" involving the transportation of several ounces of cocaine); *In re Andre W.*, 256 Neb. 362, 590 N.W.2d 827 (1999)(proper to frisk man in apartment used solely for the distribution of crack cocaine and who "generally fit the description of the suspected drug dealer").

**13.** *See e.g., United States v. Trullo*, 1st Cir., 809 F.2d 108 (1987) (court emphasized that in addition to the officer's knowledge of the suspect as a suspected drug dealer, the officer also noticed a bulge in the suspect's pocket which could have been a weapon); *United States v. Pajari*, 8th Cir., 715 F.2d 1378 (1983) (pat-down justified by officers' belief that they were confronting a major narcotics dealer who nervously reached for his lower leg as officers approached); *People v. Lee*, 194 Cal. App.3d 975, 240 Cal.Rptr. 32 (1987)(pat-down allowed; "coupled with the officer's knowledge that persons engaged in selling narcotics frequently carry firearms" was the fact that the suspect "placed his hand inside his jacket" as he turned towards the officer); *State v. Ransom*, App.Div., 169 N.J.Super. 511, 405 A.2d 411 (1979)(search justified because informant's tip concerning narcotics dealer also indicated that the suspect was armed).

**14.** *Terry*, 392 U.S. at 27, 88 S.Ct. 1868.

ion case, the United States Supreme Court emphasized that the standard by which the reasonableness of a pat-down search will be measured invokes more than an officer's generalized statements and subjective impressions; the officer must be able to "point to particular facts from which he reasonably inferred that the individual was armed and dangerous." [15] Ten years later, the United States Supreme Court invalidated a "protective frisk" because there was no evidence of an objectively reasonable belief that the suspect was armed and dangerous.[16] Writing for the Court, Justice Stewart characterized the *Terry* rule as creating:

> [A]n exception to the requirement of probable cause, an exception whose "narrow scope" this Court has been "careful to maintain." ... Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons"

or, indeed, any search whatever for anything but weapons. The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked* .... [17]

The Court is convinced that the more prudent interpretation of *Terry* is to require that an officer base a determination that his safety or that of others is in danger upon more than his belief that the suspect is a *drug dealer* and his knowledge that drug dealers often carry weapons. Indeed, allowing pat-down searches of suspected drug dealers to be conducted as a matter of routine practice, without other attendant circumstances, would eviscerate *Terry's* requirement that the pat-down be based on a particularized suspicion developed by the officer with respect to each individual suspect.[18]

---

**15.** *Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). *See also, United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)("The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.' ") (citations omitted).

**16.** *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

**17.** *Ybarra*, 444 U.S. at 93–94, 100 S.Ct. 338 (emphasis supplied). *See also, United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio*, said that, '[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*' ") (citations omitted, emphasis in original).

**18.** The Court's holding today appears to comport with other Delaware cases addressing

*Terry* "stops and frisks" of suspected drug dealers. All of these cases involve instances where the officer's pat-down search of the suspect was based upon observations or information in addition to the suspect's status as a drug dealer. *E.g., State v. Hicklin*, Del.Super., I.D. No. 9909013261, 2000 WL 970713, 2000 Del.Super. Lexis 234, Del Pesco, J., at *10 (Mar. 15, 2000)(Mem. Op.) (concluding that search of suspected drug dealer was reasonable when the suspect behaved oddly, would not give verbal responses to inquiry and would not remove his hands from his pockets in spite of repeated requests); *State v. Williams*, Del.Super., I.D. No. 9711002456, 1999 WL 167847, 1999 Del.Super. Lexis 109, Toliver, J., at *5–6 (Jan. 25, 1999) (pat-down search of suspected drug dealer deemed reasonable when suspect answered officers' questions evasively and began to walk away from the officer); *State v. Doleman, supra*, at *6 (pat-down search of suspected drug dealer deemed reasonable when police officer received tip that suspect would be located in a neighborhood where the officers knew that numerous shootings had occurred); *Morris v. State*, Del.Supr., No. 333, 1993, 645 A.2d 569, 1994 Del. Lexis 166, Holland, J., at *4, 9 (1994) (ORDER) (police pat-down of suspected drug dealer deemed reasonable when the

In this case, it is clear that Detective Jones conducted the pat-down search of Dollard based solely upon his belief that Dollard was a drug dealer and his belief that drug dealers often carried weapons. Under these circumstances, the Court concludes that Detective Jones' pat-down of Dollard violated his Fourth Amendment Right under the United States Constitution to be free from unreasonable searches and seizures, his similar right under Article I, Section 6 of the Delaware Constitution and 11 *Del. C.* § 1903.[19] Accordingly, any evidence seized as a result of the illegal pat-down search must be suppressed.

### C. The Plain Touch Doctrine

■ To complete the analysis of the *Terry* issue, the Court will address Dollard's contention regarding the propriety of Detective Jones' seizure of the contents of his jacket pocket.[20] Specifically, Dollard contends that even if the Court were to conclude that the pat-down search was appropriate, Detective Jones was not justified in reaching into Dollard's jacket pocket because he could not reasonably have believed that what he felt in that pocket was a weapon. Dollard's argument ignores the officer's testimony and the "plain touch doctrine."

Detective Jones testified that upon conducting the pat-down search of Dollard, he felt in one of Dollard's jacket pockets a hard substance contained in what felt and sounded like a plastic wrapper. Detective Jones testified that this combination yields a "distinct feeling" which he has felt several times before and which he knows to be packaging for illegal drugs.

■ "A police officer may seize non-threatening contraband detected during a pat-down search if the identity of that contraband is immediately apparent from plain sight or plain touch."[21] Courts will condone the seizure of contraband under these circumstances because it is deemed that the officer commits no further invasion of the suspect's privacy by seizing contraband that has already been identified.[22]

Here, Detective Jones knew immediately upon conducting the pat-down that he was feeling a plastic bag with a rock-like substance inside. He extracted the bag from Dollard's pocket because he knew plastic bags are commonly used in the sale of narcotics. Because the incriminating nature of the plastic bag was immediately apparent to Detective Jones, it would have been reasonable and lawful for him to seize the item as evidence if the pat-down itself had been lawful.[23]

### III. CONCLUSION

The Court concludes that the pat-down search of Dollard was not based upon a

---

officer noticed that the defendant began to act "real nervous and kept putting his hands in his pockets").

19. To be clear, the Court concludes that this result is mandated by the Fourth Amendment of the United States Constitution, Art. I., § 6 of the Delaware Constitution *and* 11 *Del. C.* § 1903. *Cf. Jones*, 745 A.2d at 868 (concluding that a *Terry* stop which may have been lawful under the Fourth Amendment was not lawful under the Delaware Constitution).

20. The Court addresses this issue for clarity's sake in the event the State elects to pursue an appeal of this decision pursuant to 10 *Del. C.* § 9902(b), (c).

21. *Mosely v. State*, Del.Supr., No. 451, 1998, 2000 Del. Lexis 90, Veasey, C.J., at *3 (Feb. 29, 2000) (ORDER) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 376–77, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)).

22. *Id.; Dickerson*, 508 U.S. at 377, 113 S.Ct. 2130.

23. *See, State v. Doleman, supra,* at *7.

reasonable, articulable suspicion that he might be armed and dangerous. Consequently, any evidence seized from Dollard would be the fruit of an unlawful search. The statement taken from Dollard following the unlawful search is the fruit of an unlawful arrest and detention.[24] Accordingly, Dollard's Motion to Suppress Evidence is GRANTED.

24. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).