# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE, )
)
)
v. ) I.D. No. 1809014012
)
)
MALIK STEVENS, )
)
Defendant. )

Submitted: November 25, 2019
Decided: December 12, 2019

## MEMORANDUM OPINION

*Upon Consideration of Defendant's Revised Motion to Suppress*,
**GRANTED.**

Zachary Rosen, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware. *Attorney for the State of Delaware*.

Thomas A. Pedersen, Esquire, Law Office of Thomas Pedersen, Georgetown, Delaware. *Attorney for Defendant*.

**MEDINILLA, J.**

## I. INTRODUCTION

A probation officer with the Safe Streets Task Force conducted a traffic stop, detaining Defendant Malik Stevens ("Stevens") after he allegedly failed to utilize a turn signal when he turned into a residential neighborhood in New Castle County. The probation officer detained Stevens in the driveway of his girlfriend's residence. A police officer called to the scene shortly thereafter conducted multiple searches of Stevens' person and an extensive search of his vehicle that yielded no evidence. Approximately one hour later, police obtained consent from Stevens to search his phone and from his girlfriend to search her residence where police eventually discovered evidence of drugs and firearms.

In this Motion to Suppress, Stevens challenges the admissibility of the evidence under Caldwell *v. State*[1] and *Murray v. State*,[2] arguing his search and seizure violated the Fourth and Fourteenth Amendments of the United States Constitution, Article I, § 6 of the Delaware Constitution, and Delaware statutory law. For the reasons that follow, the Court finds the State fails to meet its burden by a preponderance of the evidence to establish the officer had sufficient reasonable

---

[1] *See generally* 780 A.2d 1037 (Del. 2001) (holding that a traffic stop must be justified from the outset by a reasonable suspicion of criminal activity and that the investigation must be reasonably related in scope to the stop's initial justification to comport with the Fourth Amendment).

[2] *See generally* 45 A.3d 670 (Del. 2012) (holding that any measurable extension of time beyond that needed to complete a traffic stop is a separate seizure).

articulable suspicion to stop Stevens and justify the seizure. With insufficient evidence, Defendant's Motion to Suppress is **GRANTED**.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. Factual Background

Senior Probation Officer DuPont (PO DuPont) is a probation officer and a member of the Special Operations Division, specifically the Safe Streets Task Force Unit ("Safe Streets").[4]  Detective Andrew Rosaio ("Rosaio") is also a member of Safe Streets employed as a police officer with the New Castle County Police Department.  At approximately 10:00 am on September 25, 2018, members of Safe Streets conducted a "proactive mobile patrol along the Route 9 corridor."[5]

Rosaio did not accompany PO DuPont while on patrol.  According to Rosaio, PO DuPont observed a 2013 gold Ford Edge traveling northbound on New Castle Avenue, and allegedly observed Stevens fail to utilize his turn signal while completing a left hand turn onto Mansion Parkway.[6]  PO DuPont did not supervise

---

[3] The Court's recitation is based on the evidence presented at the suppression hearing on August 23, 2019 and the evidence introduced therein, including:  Joint Exhibit 1, Defendant's Exhibit 1, Defendant's Exhibit 2, and the State's Search Warrant Application and Affidavit.

[4] Safe Streets is described as a joint task force between police and probation officers. *See* Motion to Suppress Hearing Transcript - Morning, (Aug. 23, 2019) 27:23-28:3 [hereinafter "Hearing Tr. I"] (Safe Streets allows police officers to "work hand in hand with probation and parole.  Some of [the] responsibilities include monitoring and entering probationers to ensure compliance with their conditions, and [to] also conduct proactive investigations into criminal activity within [their] jurisdiction.").

[5] State's Search Warrant Application and Aff. at ¶ 2.

[6] *Id.* at ¶ 4.

Stevens nor was Stevens subject to the provisions of any Interstate Compact that would place him under supervision in this State. Although Stevens was not a probationer in Delaware, law enforcement knew him to be under community supervision in another State.

According to Rosaio, PO DuPont followed Stevens into the neighborhood and stopped Stevens' vehicle[7] after Stevens backed into and parked in the driveway of his girlfriend's residence. PO DuPont then blocked Stevens' car with his vehicle.[8] He then approached Stevens who remained seated in the driver's seat of his vehicle.[9] Stevens was the only occupant.[10] Rosaio reported that PO DuPont then ordered Stevens to produce documentation and Stevens complied.[11]

Rosaio testified he arrived at the scene within "twenty seconds" of being called by PO DuPont.[12] Specifically, he testified as follows:[13]

> Counsel: Where were you in relation to him when he made the vehicle stop?
>
> Rosaio: I believe I was just about in the turn lane on New Castle Ave to complete a left-hand turn onto Mansion Parkway.
>
> Counsel: Were you immediately behind . . . DuPont?

---

[7] *See* Defendant's Revised Motion to Suppress, *State of Delaware v. Malik S. Stevens*, Crim. ID No. 1809014012, D.I. 26 (May 24, 2019) at ¶ 4 [hereinafter "Def.'s Rev. Mot."]; *see also* Hearing Tr. I at 36:1-5.
[8] Def.'s Rev. Mot. at ¶ 3.
[9] Joint Exhibit 1; *Id.* at ¶¶ 2-5.
[10] Def.'s Rev. Mot. at ¶¶ 2-5; *see* Joint Exhibit 1.
[11] Hearing Tr. I at 33:19-34:5.
[12] *Id.* at 33:11-13.
[13] *Id.* at 32:11-34:5.

Rosaio:     He was not in eyesight when he actually contacted Mr. Stevens initially . . . .

Counsel:    And did you see . . . DuPont light up from your vantage point?

Rosaio:     When he initially activated them?

Counsel:    Yes.

Rosaio:     No.

Counsel:    And you said you arrived about 20 seconds later?

Rosaio:     Approximately.

Counsel:    Do you recall talking to . . . DuPont at that point?

Rosaio:     When I arrived on scene?

Counsel:    Yes.

Rosaio:     Yes.

Counsel:    And do you recall him talking to you about some of the conversation he had had with Mr. Stevens at that point?

Rosaio:     I believe he said something about his license. He didn't have a valid license or something along the lines of that.

Counsel:    Your conversation with . . . DuPont cause you to question your 20 second estimation? Do you think he got all that information in 20 seconds?

Rosaio:     Yes.


A body camera on Rosaio's person captured the events that unfolded

5

thereafter.[14] Within seconds of approaching the vehicle, Rosaio removed Stevens and immediately placed him in handcuffs, stating, "You're being detained[,]"[15] adding "overall because you don't have a license," and "because there was weed on your lap."[16] Rosaio testified he detected the odor of raw marijuana upon five feet of approaching Stevens' vehicle.[17] Rosaio explained further that he observed trace amounts of raw marijuana scattered about Stevens' person, and within his vehicle, in the form of "flakes" and a "straw with a residue" he considered to be consistent with heroin.[18]

With Stevens handcuffed and outside of his vehicle, Rosaio conducted the first pat down search of Defendant.[19] Rosaio searched between Stevens' legs and his buttocks, asking, "Do you have something in your butt . . . ?"[20] Stevens responded, "No."[21] After a thorough search, the officer discovered nothing on Stevens' person.

Rosaio next told Stevens he was not under arrest.[22] He then conducted an extensive search of Stevens' vehicle, including all compartments, under and inside

---

[14] *See* Joint Exhibit 1; *see also* Defendant's Exhibit 1; *see also* Defendant's Exhibit 2.
[15] Joint Exhibit 1; *see* Hearing Tr. I at 34:22-35:1.
[16] Joint Exhibit 1.
[17] Hearing Tr. I at 34:6-8.
[18] *Id.* at 30:7-13, 43:13-44:4; *see* Joint Exhibit 1.
[19] *See* Joint Exhibit 1; *see also* Hearing Tr. I at 34:6-35:14.
[20] Joint Exhibit 1.
[21] *Id.*
[22] *Id.*

the rear trunk area, and under the hood of the vehicle.[23] This search yielded nothing.

Rosaio then asked Stevens about his probation status, his listed address, and requested information about his girlfriend and her whereabouts.[24] Stevens responded, including providing his girlfriend's name.[25]

Rosaio then conducted a second pat down search of Stevens' person.[26] Rosaio testified that "secondary search[es]" were "often [done]"[27] even though he had conducted a "pretty thorough search of [Stevens'] person" the first time.[28] He again requested Stevens to "spread [his] legs wide," and conducted the same search, including his buttocks and legs.[29] Rosaio found nothing and escorted Stevens to the back of his police vehicle with an explanation that he was not arresting—only detaining—him.[30] Then Rosaio read Stevens his rights under *Miranda*.[31]

Throughout these searches and within this period, Rosaio did not question Stevens about the alleged traffic violation.[32] Instead, the police inquiry was

---

[23] Hearing Tr. I at 37:2-15; *see* Joint Exhibit 1.
[24] *See* Joint Exhibit 1; *see also* Defendant's Exhibit 1; *see also* Defendant's Exhibit 2.
[25] *See* Joint Exhibit 1; Defendant's Exhibit 1; Defendant's Exhibit 2.
[26] Hearing Tr. I at 30:22-31:2; *see* Joint Exhibit 1.
[27] Hearing Tr. I at 30:22-31:2.
[28] *Id.* at 34:12-18.
[29] Joint Exhibit 1.
[30] *Id.*
[31] Hearing Tr. I at 31:2-6; *see* Joint Exhibit 1; *see* State's Response to Defendant's Motion to Suppress, *State of Delaware v. Malik S. Stevens*, Crim. ID No. 1809014012, D.I. 20 (April 18, 2019) at page 2 [hereinafter "State's Resp."].
[32] Hearing Tr. I at 42:18-23.

repetitive and focused on potential and suspect contraband "in the house."[33]  Rosaio conceded that he "tailored [his questions] around the traffic stop, [but] [was] also prompted by some of the information [gathered] through confidential sources and informants" provided in "August and September 2018" about drug-related activity "along the Route 9 corridor."[34]

With Stevens in the police vehicle, Rosaio conducted a third search of Stevens, this time asking him to remove his shoes.[35]  This search also yielded nothing.  After more questioning, the audio from the body camera depicts Rosaio stating, "He's going to consent to at least a search of his phone."[36]  The body camera does not capture the exchange that led to Stevens giving any consent, but Rosaio asks Stevens, "Ok, you don't mind?"[37]  Stevens says "No" and he provides his password to unlock his cell phone.[38]  For several minutes, Rosaio scrolled through numerous pictures and text messages.[39]  An image or two prompts Rosaio to ask questions about "firearms and large quantities of United States Currency."[40]  Stevens

---

[33] Rosaio repeatedly questioned Stevens about whether he lived at his girlfriend's residence, if he had any property located there, and whether illegal contraband was present in the house.  *See* Joint Exhibit 1; *see also* Hearing Tr. I at 41:13-42:9.  Defendant admitted he stayed at his girlfriend's house and had a possessory interest in the residence such that neither side was raising any issue related to standing.  *See* Joint Exhibit 1.

[34] Hearing Tr. I at 41:8-42:14; *see* State's Search Warrant Application and Aff. at ¶ 7.

[35] *See* Joint Exhibit 1.

[36] Defendant's Exhibit 2.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] Defendant's Exhibit 2; *see* State's Search Warrant Application and Aff. at ¶ 11.

responded that he "just liked the black [gun]," that he "didn't buy nothing,"[41] and that the "money [was] from the casino."[42]

Approximately an hour after the initial stop, Stevens' girlfriend arrived at her residence.[43] The body camera did not capture this exchange and Rosaio could not recall how he conducted his investigation as to her identity, her address, or anything related to her.[44] The record is also unclear about what communications took place between her and law enforcement but Rosaio testified that the girlfriend gave consent to enter her residence,[45] and that he asked her questions regarding Stevens' marijuana use.[46] She escorted police to her bedroom where Stevens slept. This led to the recovery of a sandwich bag and a Mentos container with marijuana,[47] later quantified as a "personal use" amount.[48]

The State then obtained a search warrant executed at 12:44 pm, approximately three hours from the time of the stop.[49] That search yielded evidence to include greater quantities of marijuana, United States currency, and two firearms. Stevens

---

[41] Defendant's Exhibit 2.
[42] *Id.*
[43] Hearing Tr. I at 46:8-19.
[44] *Id.* at 44:18-19.
[45] *Id.* at 47:18-48:5.
[46] *Id.*
[47] *Id.*; *see* State's Search Warrant Application and Aff. at ¶ 13-14; *see also* Def.'s Rev. Mot. at ¶ 11.
[48] Hearing Tr. I at 50:7-10.
[49] Def.'s Rev. Mot. at ¶ 12.

was arrested and charged with Drug Dealing, Aggravated Possession, two counts of Possession of a Firearm During the Commission of a Felony, several counts of Possession of a Firearm (and Ammunition) by Person Prohibited, Possession of Drug Paraphernalia, and Failure to Make Left Turn.[50]   Law enforcement did not collect any physical evidence from the pat down searches or the search of the vehicle.  Nor did they test any of the alleged flakes of marijuana or straw paraphernalia described on Stevens' person and in his vehicle.[51]  Stevens was not charged with crimes related to the flakes or the straw.[52]

### B. Procedural Background

On March 14, 2019, Defendant filed his Motion to Suppress.[53]  On April 18, 2019, State filed its Response,[54] and on May 21, 2019, Defendant filed a Revised Motion to Suppress Evidence.[55]   On June 24, 2019, State filed its Supplemental Response to Defendant's Revised Motion to Suppress.[56]  Oral arguments took place on August 23, 2019.

---

[50] Indictment, True Bill Filed, *State of Delaware v. Malik S. Stevens*, Crim. ID No. 1809014012, D.I. 3 (Nov. 29, 2018).

[51] Hearing Tr. I at 37:23-39:4.

[52] *Id.* at 44:8-17.

[53] *See* Defendant's Motion to Suppress, *State of Delaware v. Malik S. Stevens*, Crim. ID No. 1809014012, D.I. 18 (March 14, 2019).

[54] *See* State's Resp.

[55] *See* Def.'s Rev. Mot.

[56] *See* State's Supplemental Response to Defendant's Revised Motion to Suppress, *State of Delaware v. Malik S. Stevens*, Crim. ID No. 1809014012, D.I. 28 (June 24, 2019).

On November 13, 2019, the Court requested that the State and Stevens provide supplemental briefing to identify the legal authority that allows probation officers to conduct routine traffic stops.[57] On November 20, 2019, the State responded with a string of statutory provisions to suggest that—when pieced together—the law gives probation officers the same authority provided to a police officer to conduct traffic stops.[58] On November 25, 2019, Stevens responded and argued that neither Delaware case law nor statutory language provide the authority for probation officers to make such arrests.[59] The matter is ripe for review.

---

[57] *See* this Court's Letter, *State of Delaware v. Malik S. Stevens*, Crim. ID No. 1809014012, D.I. 31 (Del. Super. Nov. 14, 2019).

[58] *See* State's Response to this Court's Letter, *State of Delaware v. Malik S. Stevens*, Crim. ID No. 1809014012, D.I. 32 (Nov. 20, 2019) (citing 11 *Del. C.* § 431(d) ("Probation and parole officers shall exercise the same powers as constables under the laws of this State."); 10 *Del. C.* § 2705 (constables shall "[e]xercise the same powers as peace officers and law-enforcement officers, in order to protect life and property, while in the performance of the lawful duties of employment."); 11 *Del. C.* § 222 (the definition of law-enforcement officer "includes police officers."); 21 *Del. C.* § 701 (police officers "may arrest a person without a warrant [f]or violation of [Title 21] committed in their presence.").

[59] *See* Defendant's Response to this Court's Letter), *State of Delaware v. Malik S. Stevens*, Crim. ID No. 1809014012, D.I. 33 (Nov. 25, 2019) (citing *Christopher v. Sussex County*, 77 A.3d 951 (Del. 2013) (holding that the sheriff's common law arrest power is not a fundamental duty of his constitutional role as a "conservator of the peace," because the common law arrest power of a sheriff was not fundamental, but was merely incidental, to his role as a "conservator of the peace"); *Watson v. State*, 986 A.2d 1165, 2010 WL 376882 (Del. Jan. 6, 2010) (TABLE) (holding that probation officers were not "police officers" within meaning of resisting arrest statute, and thus, felony resisting arrest statute was inapplicable to defendant who resisted arrest against probation officers); *Lum v. State*, 193 A.3d 733, 2018 WL 4039898 (Del. Aug. 22, 2018) (TABLE) (affirming the finding of the defendant's guilt following a search and seizure where defendant untimely raised his argument on appeal); RE: Opinion of the Attorney General relating to the Sheriff as a Police, Officer Del. Op. Atty. Gen. 00-IB16 (Del. A.G.), 2000 WL 1920107 ("The fact that the sheriff, and persons like constables, parole officers, correctional officers and the Attorney General and her Deputy Attorneys General, may have certain law enforcement authority does not make them police officers as defined by Delaware law.").

## III. CONTENTIONS

Stevens argues he was subjected to an illegal detention and arrest as defined under *Caldwell v. State*[60] and *Murray v. State*,[61] or alternatively, that his constitutional rights were violated where the State exceeded its authority through the actions of the probation officer to conduct a pre-textual stop without justification to do so.[62]

The State argues police had justification to extend the initial traffic stop where trace amounts of raw marijuana on Stevens' clothing and vehicle[63] created a basis for the additional investigation. The State also argues no constitutional foul occurred where both Stevens and his girlfriend gave separate consent to search the cell phone and the residence, respectively.

## IV. STANDARD OF REVIEW

Not surprisingly, both sides also disagree as to who bears the burden in this case. The State argues that the existence of a search warrant places the burden upon Stevens to establish a violation of his constitutional rights. It is true that on a motion

---

[60] *See generally Caldwell v. State*, 780 A.2d 1037 (2001).
[61] *See generally Murray v. State*, 45 A.3d 670 (2012).
[62] To the Deputy Attorney General's credit, in response to this Court's inquiry during oral arguments, the State conceded that the stop may have been pre-textual and argued that Delaware law permits such stops. For purposes of this ruling, the Court need not address issues raised regarding the validity of pre-textual stops under Delaware law, nor does the Court accept defense counsel's invitation to revisit current case law on this issue. *See* Motion to Suppress Hearing Transcript - Afternoon, (Aug. 23, 2019) at 1:11-23 [hereinafter "Hearing Tr. II"].
[63] State's Search Warrant Application and Aff. at ¶ 9.

to suppress, "the defendant bears the burden of establishing that the challenged search or seizure violated his rights under the United States Constitution, the Delaware Constitution, or the Delaware Code."[64] "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable."[65] Here, where the events began with the first warrantless seizure after the traffic stop, "the State bears the burden of establishing that the challenged search or seizure comported with the rights guaranteed by the United States Constitution, the Delaware Constitution, and Delaware statutory law."[66]

## V.   DISCUSSION

The Fourth[67] and Fourteenth Amendments[68] of the United State Constitution and Article I, § 6 of the Delaware Constitution[69] protect citizens from illegal searches and seizures.  A traffic stop constitutes such a seizure of a vehicle and those within

---

[64] *State v. Nyala*, 2014 WL 3565989, at *5 (Del. Super. Ct. July 17, 2014) (citing *State v. Dollard*, 788 A.2d 1283, 1286 (Del. Super. Ct. 2001)).

[65] *State v. Dillard*, 2018 WL 1382394, at *2 (Del. Super. Ct. Mar. 16, 2018), *reargument denied*, 2018 WL 2264414 (Del. Super. Ct. May 17, 2018), *and aff'd*, 207 A.3d 136 (Del. 2019), *and aff'd*, 207 A.3d 136 (Del. 2019) (quoting *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995))**;** s*ee State v. Chandler*, 132 A.3d 133, 139 (Del. Super. Ct. 2015), *as corrected* (Del. Super. Ct. Apr. 14, 2015).

[66] *Chandler*, 132 A.3d at 139 (Del. Super. Ct. 2015) (citing *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001)); *see State v. Preston*, 2016 WL 5903002, at *2 (Del. Super. Ct. Sept. 27, 2016) (quoting *State v. Kang*, 2001 WL 1729126, at *3 (Del. Super. Ct. Nov. 30, 2001)).

[67] *See* U.S. Const. amend. IV.

[68] *See* U.S. Const. amend. XIV.

[69] *See* DE Const. art. I, § 6.

the vehicle.[70]  As such, the State is required to "demonstrate that the stop and any subsequent police investigation were reasonable in the circumstances."[71]  A traffic stop does not violate Fourth Amendment rights where it supported by reasonable suspicion or probable cause that a traffic violation has occurred.[72]  A traffic stop must be "justified at its inception by reasonable suspicion of criminal activity."[73]

## A. Insufficient Evidence of a Valid Traffic Stop

Generally, a traffic stop will not infringe upon a driver's Constitutional rights "if *police* have probable cause to believe that the driver has committed a traffic violation."[74]  Sufficient probable cause exists when an officer observes a traffic violation.[75]  Here, PO DuPont allegedly observed a traffic violation and conducted the initial traffic stop.  Without the assistance of police, PO DuPont used the color

---

[70] *Caldwell v. State*, 780 A.2d 1037, 1045 (Del. 2001).

[71] *Id.* at 1046.

[72] *See Whren v. United States*, 517 U.S. 806, 810 (1996); *see also Holden v. State*, 23 A.3d 843, 847 (Del. 2011) ("A police officer who observes a traffic violation has probable cause to stop the vehicle and its driver."); *see also State v. Ellerbe*, 2014 WL 605481, at *3 (Del. Super. Ct. Jan. 27, 2014) (Further, "[t]he case law in Delaware is clear that while probable cause will serve as the basis for a traffic stop, only a reasonable articulable suspicion of criminal activity is required."); see also *State v. Rickards*, 2 A.3d 147, 151 (Del. Super. Ct. 2010), *aff'd,* 30 A.3d 782 (Del. 2011) (citing *State v. McDannell*, 2006 WL 1579818, at *2 (Del. Super. Ct. May 16, 2006) (citing *Whren*, 517 U.S. at 810)).

[73] *Caldwell*, 780 A.2d at 1046 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (citing *Terry v. Ohio*, 392 U.S. 1, 16–19 (1968) ("[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."))).

[74] *State v. Huntley*, 777 A.2d 249, 254 (Del. Super. Ct. 2000) (citing *Whren*, 517 U.S. at 810; *Delaware v. Prouse*, 440 U.S. 648, 659 (1979))(emphasis added).

[75] *State v. Chandler*, 132 A.3d 133, 140 (Del. Super. Ct. 2015), *as corrected* (Apr. 14, 2015) (citing *Holden v. State*, 23 A.3d 843, 847 (Del. 2011)).

of authority to independently follow, block-in, approach, question, and detain Stevens until police arrived.

There is disagreement as to whether PO DuPont had the authority[76] to act as he did. Yet it is undisputed that his actions would have led a reasonable person to believe he was not at liberty to ignore *police presence*, and constituted a seizure under both the Fourth Amendment and Article I, § 6 of the Delaware Constitution.[77] Acting under the presumed authority afforded to him through Safe Streets, it is therefore undisputed that under *Lopez-Vazquez v. State*,[78] the first seizure of Stevens occurred before police arrived.

Even if PO DuPont was authorized to conduct the traffic stop, in assessing the reasonableness of this seizure during the traffic stop, the Court asks two questions: (1) "whether the officer's action was justified at [the traffic stop's] inception," and (2) "whether [the traffic stop] was reasonably related in scope to the circumstances which justified the interference in the first place."[79] In answering these two

---

[76] The Court need not address whether a probation officer has the legal authority to conduct a traffic stop where the Court raised this issue post-oral arguments, and except for correspondence provided by both sides, neither side had the benefit of providing full briefing on this issue.

[77] *See Jones v. State*, 28 A.3d 1046, 1051 (Del. 2011) (citing *Jones v. State*, 745 A.2d 856, 869 (Del. 1999); *Loper v. State*, 8 A.3d 1169, 1173–74 (Del. 2010); *Moore v. State*, 997 A.2d 656, 663–64 (Del. 2010); *Williams v. State*, 962 A.2d 210, 215-16 (Del. 2008); *Lopez-Vazquez v. State*, 956 A.2d 1280, 1286 n. 6 (Del. 2008); *Ross v. State*, 925 A.2d 489, 493–94 (Del. 2007); *Harris v. State*, 806 A.2d 119, 124 (Del. 2002); *Flonnory v. State*, 805 A.2d 854, 858 (Del. 2001); *Woody v. State*, 765 A.2d 1257, 1264 (Del. 2001)).

[78] *Lopez-Vazquez*, 956 A.2d at 1286 ("Under the Fourth Amendment to the United States Constitution, a seizure requires either physical force or submission to assertion of authority.").

[79] *State v. Huntley*, 777 A.2d 249, 254-55 (Del. Super. Ct. 2000) (citing U.S. Const. amend. IV. (The Fourth Amendment to the United States Constitution, made applicable to the states through

questions, the Court uses an objective standard assessing the facts available to the officer at the time of the seizure.

Reasonable articulable suspicion mandates that officers indicate "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the traffic stop.[80] In order to determine the existence of reasonable suspicion, it must consider "the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[81] It is reasonable for the Court to "defer to the experience and training of law enforcement officers."[82]

PO DuPont is not a trained police officer. The view from the eyes of a trained police officer is only clear when police arrived after the alleged traffic stop. The State introduced the observations of PO DuPont through a police officer who was neither present when Stevens allegedly committed a traffic infraction nor when PO DuPont made his decision to seize Stevens. And although not unusual for officers

---

the Fourteenth Amendment, provides for "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures.")).

[80] *Id.* at 255 (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Downs v. State*, 570 A.2d 1142, 1145 (Del. 1990); *State v. Brown*, No. 9710011034, 1998 WL 961751, at *1 (Del. Super. Ct. July 27, 1998)).

[81] *State v. Dillard*, 2018 WL 1382394, at *6 (Del. Super. Ct. Mar. 16, 2018), *reargument denied*, 2018 WL 2264414 (Del. Super. Ct. May 17, 2018), and *aff'd*, 207 A.3d 136 (Del. 2019), and *aff'd*, 207 A.3d 136 (Del. 2019) (quoting *Jones v. State*, 745 A.2d 856, 861 (Del. 1999)).

[82] *Id.* (quoting *Woody v. State*, 765 A. 2d 1257, 1262 (Del. 2001) (citing *Jones v. State*, 745 A.2d 856, 861 (Del. 1999))).

to rely upon—and for the Court to accept—hearsay observations of alleged criminal activity, and the collective knowledge of other investigating officers to support considerations for probable cause or reasonable articulable suspicion, the circumstances in this case are different.[83]

The *only* evidence of the traffic violation that served as the impetus for all police contact thereafter is through PO DuPont. Crucial to the Court's determination of the validity of the stop is to ascertain what facts were available to PO DuPont when he first observed Stevens and his interpretation of those facts that led him to act as he did. It is unclear when, how and what observations were made except that Rosaio testified that a probation officer observed Stevens commit a traffic violation. After that, the evidence describes only what the officer did to detain Stevens and call for police involvement. The evidence presented in this vacuum creates gaps as to whether the actions were lawful, leaving the Court to speculate as to whether the probation officer's actions were justified at the traffic stop's inception.

Furthermore, the Court cannot assess the facts available to that officer when he blocked in, approached, questioned and seized Stevens. There is no evidence regarding the exchange between PO DuPont and Stevens except that the officer acted under some authority that compelled Stevens to remain in his vehicle and turn over

---

[83] *See generally State v. Morris*, 2017 WL 6513487 (Del. Super. Ct. Dec. 19, 2017) (holding that reliance upon hearsay information provided by fellow police officers was appropriate where the collective knowledge of other investigating officers is imputed to other officers).

documentation.  Left to consider only the testimony of the testifying officer in lieu of the seizing officer, the Court finds the evidence insufficient.  Although Rosaio stated he arrived within twenty seconds of being called to the scene, it is unclear how long Stevens was detained and questioned, what questions were asked, if questioning was limited to the traffic violation, and if the probation officer followed any protocol when he compelled Stevens to comply with his request for documentation.[84]   The Court also does not find credible the testimony that suggests this entire exchange took 20 seconds.  For these reasons, the Court finds the State fails to meet its burden by a preponderance of the evidence to establish a traffic violation occurred or that the officer had sufficient reasonable articulable suspicion to justify the seizure.

## B. Extended Duration and Scope of Traffic Stop and Drug Investigation

The Court need not address whether there was a "second detention" under *Caldwell* because it has found that the State fails to meet its burden proof as stated. Even if the evidence had been sufficient, a police officer may not detain an individual

---

[84] *See State v. Morris*, 2017 WL 6513487, at *3–4 (Del. Super. Ct. Dec. 19, 2017) (citing *State v. Holmes*, 2015 WL 5168374 (Del. Super. Ct. Sept. 3, 2015) (finding that the State failed to meet burden of proof on warrantless search where court could not ascertain what the arresting officers said, how the occupants responded, or what those officers were thinking from the limited knowledge available to the testifying officer who had not conducted the traffic stop); *State v. Hopkins*, 2016 WL 6958697 (Del. Super. Ct. Nov. 23, 2016) (finding that the State failed to meet burden of proof on warrantless search where testifying officer was not present at the scene when the defendant allegedly gave consent, and where consent was the only justification for the search of his person)).

18

longer than is necessary to "effectuate the purpose of the stop."[85] Once that time has passed, an officer should have "issued a citation or warning . . . [or] the vehicle must be released unless the driver voluntarily consents to further questioning or the officer uncovers facts that independently warrant additional investigation."[86] Neither the probation nor the police officer carried out the task of issuing a citation.

The State concedes that police extended Stevens' initial traffic stop in order to investigate a drug related crime and was justified in so doing.[87] Assuming the officer was justified in conducting the "second detention" when he first detected the odor of marijuana and observed raw "flakes,"[88] the scope and duration of that detention requires additional comment.

First, it remains unclear why the odor of marijuana or the plain view of "flakes" would have triggered a police response to include handcuffing Stevens within seconds of approaching him and then subjecting him to multiple invasive searches that went well beyond the purpose of ensuring officer safety.

---

[85] *Dillard*, 2018 WL 1382394, at *3; *State v. Chandler*, 132 A.3d 133, 140 (Del. Super. Ct. 2015), *as corrected* (Apr. 14, 2015); *Huntley*, 777 A.2d at 254.

[86] *Caldwell v. State*, 780 A.2d 1037, 1047 (Del. 2001); *see Rodriguez v. United States*, 135 S. Ct. 1609, 1611 (2015) ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

[87] Under *Caldwell*, any search extended beyond the initial traffic stop "constitutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion." 780 A.2d at 1042, 1047.

[88] *See* Hearing Tr. I at 30:7-34:8; *see also* Joint Exhibit 1.

An officer has "an absolute right" to complete a *restricted* search of a suspect for dangerous weapons if he reasonably believes that the suspect is currently "armed and dangerous."[89] This pat down search or "frisk" is justified only when there is reasonable articulable suspicion that the person is armed and *currently* dangerous.[90]

Detective Rosaio did not testify to having any safety concern or to believing that Stevens was presently armed and dangerous. Similarly, the body camera captures no safety concerns, especially where Stevens remained handcuffed and cooperative throughout.[91] Even if he was justified in conducting a pat down of Stevens, the first search should have addressed any safety concern. The searches after the first pat down exceeded the scope of both the traffic violation and the drug investigation where Stevens had nothing on his person nor in his vehicle to warrant further intrusion.

Second, where police never questioned Stevens regarding the alleged traffic violation, the scope and duration of all questioning focused on drug-related activity. While reasonable in response to the odor of marijuana and perhaps the straw found in the vehicle, the questioning extended well beyond. Rosaio testified that his

---

[89] *Caldwell*, 780 A.2d at 1051 (Del. 2001) (quoting *Hicks v. State*, 631 A.2d 6, 7 (Del. 1993); citing *Robertson v. State*, 596 A.2d 1345, 1352 (Del. 1991); 11 *Del. C.* § 1903 (authorizing officer to search for "a dangerous weapon any person whom the officer has stopped or detained as provided in § 1902 . . . whenever the officer has reasonable ground to believe that the officer is in danger if the person possesses a dangerous weapon") (internal citations omitted)) (emphasis added).

[90] *See Holden v. State*, 23 A.3d 843, 847 (Del. 2011) (emphasis added).

[91] *See* Joint Exhibit 1; *see also* Defendant's Exhibit 1; *see also* Defendant's Exhibit 2.

questioning was "prompted by some of the information [gathered] through confidential sources and informants leading up to that day."[92]  Yet nothing regarding the timing or reliability of these sources had any connection to the girlfriend's residence.[93]

Albeit not necessary to this ruling because the State did not argue that this information was at all reliable or verified, the information related to drug-related activity "along the Route 9 corridor" did not establish a nexus to the possession or presence of illegal contraband at the girlfriend's residence.  Nevertheless, police riddled Stevens with unrelenting questioning and tactics to establish this connection.  The Court cautions and reminds Safe Streets of prior admonitions that its practices must fall within constitutional boundaries.[94]

## C. Consent Is Insufficient

The State's final argument is that the consent of both Stevens and his girlfriend break any connection between the initial detention and the search warrant.  Thus, it argues that consent saves the search warrant from any constitutional challenge.  This Court disagrees.  "When a person is illegally detained before he

---

[92] Hearing Tr. I at 41:8-12.
[93] *See* Hearing Tr. I at 42:10-17.
[94] *See State v. Johnson*, No. 1401008161, 2014 WL 6661154, at \*4 (Del. Super. Ct. Oct. 30, 2014) ("Based upon this finding, the Court need not address Johnson's second argument regarding the makeup and conduct of the Safe Streets unit. The Court would however caution that reasonable care should occur regarding the approval of these warrants.").

purports to give consent [to search], his consent may not be sufficient to cleanse the illegal detention's taint."[95]  "If consent is given after an illegal seizure, that prior illegality taints the consent to search[.]"[96]  Evidence obtained as the result of an illegal seizure "must be suppressed as 'fruit of the poisonous tree.'"[97]

After the first pat down and vehicle searches, Rosaio questioned Stevens about his girlfriend.  It was then that police obtained the girlfriend's name.  Two pat down searches later, Stevens gives Rosaio his password that resulted in an extensive search of his phone.  The information obtained from both Stevens and his girlfriend to search the phone and residence, respectively, supplied the allegations in the search warrant application and affidavit.

---

[95] *Murray v. State*, 45 A.3d 670, 677 (Del. 2012), *as corrected* (July 10, 2012) (citing *Caldwell*, 780 A.2d at 1052 n. 40 (citing *State v. Cooley*, 457 A.2d 352, 356 (Del. 1983) ("Any implied consent attributable to Cooley was given under circumstances which did not dissipate the effect of the illegal arrest."); *State v. Wrightson*, 391 A.2d 227, 229 (Del. Super. Ct. 1978) (excluding evidence uncovered in consensual search during illegal detention after a traffic stop because it was an "exploitation of the illegal detention"); *State v. Morris*, No. 9610010230, 1997 WL 363938, at *5 (Del. Super. Ct. May 14, 1997) ("[C]onsent to search given when a defendant is being illegally detained is tainted by the illegality and is ineffective to justify the search."); *State v. Thomason*, No. IN92-07-0022, 1994 WL 637294, at *7 (Del. Super. Ct. Mar. 14, 1994), *aff'd*, 650 A.2d 1307 (Del. 1994); *State v. Huntley*, 777 A.2d 249 (Del. Super. Ct. 2000); *People v. Banks*, 650 N.E.2d 833, 835 (1995); *United States v. Chavez–Villarreal*, 3 F.3d 124, 128 (5th Cir.1993) ("[C]onsent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will.")).
[96] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1291 (Del. 2008) (citations and internal quotations omitted); *see Murray*, 45 A.3d at 677; *see also Morris*, 1997 WL 363938, at *5 (citing *Wrightson*, 391 A.2d at 228 (internal citations omitted)).
[97] *Jones v. State*, 28 A.3d 1046, 1055 (Del. 2011) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)); *see State v. Coursey*, 136 A.3d 316, 321 (Del. Super. Ct. 2016).

This Court finds a causal nexus between the unlawful detention and the consent given by Stevens and his girlfriend. The State's argument—that the girlfriend coincidentally showed up to her residence and happened to give consent— is without merit. Her name was only made available through Stevens. On this record, the allegations in the search warrant came from information obtained from the illegal seizure. The State's argument that consent successfully immunizes the search warrant from the infirmities previously mentioned is without merit.

## CONCLUSION

The State fails to meet its burden by a preponderance of the evidence to establish that the officer had sufficient reasonable articulable suspicion to justify the seizure in violation of the Fourth and Fourteenth Amendments of the United States Constitution, Article I, Section 6 of the Delaware Constitution, and Delaware statutory law. All evidence obtained from the illegal seizure is hereby suppressed as "fruit of the poisonous tree."[98] For the aforementioned reasons, Defendant's Motion to Suppress is **GRANTED**.

/s/Vivian L. Medinilla
Vivian L. Medinilla
Judge

---

[98] *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)); *see Coursey*, 136 A.3d at 321.